## SUPREME COURT — SPECIAL TERM — ALBANY COUNTY.

### March, 1918.

## FRANK OSBORN v. LEMON THOMSON et al.

### (103 Misc. 23.)

CONSTITUTIONAL LAW—UNCONSTITUTIONALITY OF LAWS OF 1912, CHAP. 445 —PUBLIC HEALTH LAW, ART. 19.

Chapter 445 of the Laws of 1912, amending the Public Health Law by adding thereto article 19, relating to operations for the prevention of procreation, is unconstitutional.

In an action brought to restrain the carrying out of the determination of the board of examiners, appointed pursuant to said statute, to perform upon plaintiff, an inmate of the Rome Custodial Asylum, who, though physically strong, was in the class known as feeble-minded, the operation known as vasectomy for sterilization, plaintiff will be granted a permanent injunction.

TRIAL had before WILLIAM P. RUDD, Justice of the Supreme Court, at Special Term, under stipulation signed by the attorneys representing the respective parties.

*Ellis J. Staley* (*J. Sheldon Frost,* of counsel), for plaintiff.

*Merton E. Lewis, Attorney-General* (*Wilber W. Chambers,* of counsel), for defendants.

RUDD, J.:

Chapter 445 of the Laws of 1912 is an act amending the Public Health Law by adding article 19 thereto, in relation to operations for the prevention of procreation. It provides in substance as follows:

1. The appointment of a board of examiners consisting of one surgeon, one neurologist and one practitioner of medicine to be known as the board of examiners of feeble-minded, criminals and other defectives.

2. Making it the duty of this board to examine into the mental and physical condition and the record and family history of the feeble-minded, epileptic, criminals and other defectives confined as inmates in the several State hospitals for the insane, State prisons, reformatories, and charitable and penal institutions of the State, and if, in the judgment of the majority of said board, procreation by any such person would produce children with an inherited tendency to crime, insanity, feeble-mindedness, idiocy or imbecility, and that there is no probability that the condition of any such person will improve to such an extent as to render procreation by any such person advisable, or if the physical or mental condition of such person will be substantially improved thereby, that then the board shall appoint one of its members to perform such operation for the prevention of procreation as shall be decided by said board to be most effective.

The criminals who shall come within the operation of this law shall be those who have been convicted of the crime of rape or of such succession of offenses against the criminal law as in the opinion of the board shall be deemed in the criminal examined to be sufficient evidence of confirmed criminal tendencies.

2. It is the duty of this board to apply to any judge of the Supreme Court or county judge of the county in which said person is confined for the appointment of counsel to represent the person to be examined. The counsel shall act for such person at a hearing before the judge or in any subsequent proceedings, and no order made by the board shall become effective until five days after it shall have been filed with the clerk of the court and a copy shall have been served upon the counsel appointed to represent the person examined. Orders made by

the board are subject to review by the Supreme Court or any justice thereof.

Under this law a board of examiners was appointed consisting of the petitioners herein. Such board determined to perform the operation known as vasectomy upon Frank Osborn, an inmate of the Rome Custodial Asylum, twenty-two years of age, strong physically, who has been an inmate of that institution for several years, and who is in the class known as feeble-minded.

As indicated by the title above, Frank Osborn, through counsel appointed by Mr. Justice CHESTER, began an action against the members constituting the board of examiners asking a permanent injunction restraining the carrying out of the determination of the board with reference to an operation upon him; and in the action thus brought are raised questions as to the constitutionality of the act.

We have under consideration the questions which have arisen in review of the determination of the board and those which result from the challenge by the counsel of Frank Osborn against the constitutionality of the act. We will first consider the determination of the board.

Dr. Lemon Thomson, one of the board of examiners, testified in substance that the board had selected Frank Osborn after learning as to his family and after submitting him to a somewhat superficial examination physically and mentally; and that such selection was made because in the opinion of the commission Osborn could not probably procreate normal offspring. His was what the board of examiners thought a bad case.

Dr. Thomson says that he has never performed the operation of vasectomy for sterilization; that in his opinion no benefit would some to the patient from the operation so far as rendering him free from the dangers of the infection of a venereal disease; that the operation would not weaken in Frank Osborn the tendency of the rapist.

Dr. Andrews, a member of the board of examiners, testified that he had never performed the operation, and that he had never seen it performed; and, while the statute required that the board should determine upon the operation which would be most effective, he stated that vasectomy would not be the most effective operation but, on the other hand, that castration would be. He further testified that he had not given any study to any particular phase of this question.

Dr. Wansboro, of the board of examiners, was not called.

Dr. Bernstein, superintendent of the Rome Custodial Asylum, where Frank Osborn has been, as an inmate, since 1907, and in which there are cared for over 1,300 patients, testified that Osborn was of a higher grade of feeble-mindedness; that the actual number of feeble-minded in our State had not proportionately increased in twenty-five years; that because of the demands of society there developed many social failures; that there had been a persistent demand for the removal of such individuals from temptations in the community; and these social failures are forced upon the attention of the State, and it has been accepted as a principle that the State must care for defectives; that such people should not be looked after by any social or political division of the State. The doctor testified that he had observed 5,000 feeble-minded patients; that Osborn could not earn his living outside of the institution if he were turned out into the world; that he had an "eight-year" mental capacity; that all patients in the institution are segregated; and upon the question of Osborn being able to procreate normal children he said: "We are taught that the dominant traits appear in three-quarters of the offspring and recessive traits appear in one-quarter, when the parentage is mixed as regards traits; that it is only in cases of feeble-mindedness of both parents that you would look generally for an increase of feeble-mindedness among offspring."

In other words, that when one parent is feeble-minded and the

other of normal mental capacity that the tendency is recessive, that is, towards the normal.

The doctor testified that vasectomy would not change any of the criminal tendencies of the feeble-minded at all; it would only eliminate the one element of procreation; that in his opinion one of the conditions which would result from a general enforcement of the law, as is here determined, would be to tend to create a class of people by themselves who would feel that they were so different from normal humanity that they would go back to promiscuous sexual relations and that there would be known places where these people were harbored and there they would tend to collect. That among a class of such persons upon whom the operation of sterilization has been performed you should find increased sexual intercourse, and that such increased illicit intercourse is a promoter of disease and general demoralization.

Dr. Bernstein, knowing Frank Osborn as an inmate of the institution of which he was superintendent, testified that he was not in favor of the operation upon Osborn which has been recommended. He further said that he did not know of one case in the 1,300 in the institution that it would be desirable to operate upon, giving as a reason that it would not help the boy, and it would not help society. Osborn will have to be supervised and cared for just as well and just as much after the operation as before; after the operation of vasectomy he will want to go where the girls are just as much as he does now; that society needs protection from the raping of little girls and the frightening of them just as much as it wants protection from a future generation of dependents and delinquents. That vasectomy upon Osborn is not going to give us the thing society wants to have, protection from his possible ravages. In the doctor's opinion this legislation is in advance of our enlightenment — we don't know to-day what we are dealing with; that a careful and scientific study of ductless glands and their secretions shows

that when such secretions forming in the body are interfered with, that physiological teaching indicates that conditions are created which affect the brain and the nervous system; and that such interference with these secretions does not cause or bring about a cure or a remedy such as is sought.

Frank Osborn testified. He did a small sum in addition; knows the days of the week; knows his age; but said that he did not know what this inquiry or proceeding meant.

Dr. Davenport, a biologist, testified that he agreed with the statements made by Dr. Sharp of Indianapolis in an article entitled "Vasectomy as a means of preventing procreation in defectives," in the statement there contained that "defective persons are not necessarily to become a public charge, for included within this class are to be found the most gifted as well as the most vicious, weakest and ordinarily the most unhappy of mankind," and mentioning a few of such instances in the names of Chatterton, Goldsmith, Coleridge and Charles Lamb.

This statute grows out of studies and efforts of those who are interested in the subject of eugenics, which has to do with the improvement of the population by taking advantage of laws of heredity; with improving through better breeding. It deals with the inheritance of traits; with changes in population through differential fecundity; the greater or less fecundity of the different classes of population; with changes of population from emigration; or better or worse strains, with hereditary basis of the traits of population. That there is to be found much of good in the most degenerate families known in our land, mentioning the Jukes and the Nams.

The doctor testified that he has not advocated the operation of vasectomy, and that in his opinion segregation of the sexes would be better.

Mr. Van Wagenen, who has studied and written upon the problems of eugenics, testified that it would be well if voluntary acceptance of such an operation could be had; that when such

operations have been done against the will of the patient the psychic effects have been bad; that he would never recommend such an operation except upon those who consented.

Dr. Coakley, a specialist in vivisection, testified as to the danger of infection because of the retained secretions in the body; that in the operation the vas deferens is severed, but that it can be reunited even after considerable length of time, and therefore nothing is accomplished.

Dr. Fernald, superintendent of the School for Feeble-Minded in Massachusetts, testified that he had never seen an authorized medical statement based upon actual facts which would justify claims made for the results in Indiana, where such a law is in operation; that the operation of vasectomy does not in the slightest interfere with the physical act of sex intercourse; that illicit intercourse would result, and the effect thereof would be the exchanging of the burden of feeble-mindedness for the burden of sex immorality or sex diseases and of insanity resulting in that condition which would be quite as serious and would affect people who are producers and burden bearers. It would prejudice many right-thinking persons who are interested in those who are afflicted against institutions, when it is known that under the law such an operation would be possible against the wishes of the person upon whom the operation is to be made.

The testimony shows that the operation of vasectomy upon the male is simple in its character; that it can be done without anaesthesia, quite painless. That upon the female it is serious in its character, requiring an abdominal incision and the risks incident thereto.

A well-authenticated case upon the records shows that in the case of a woman having been sterilized because of feeble-mindedness she was freed from any danger incident to childbirth, was therefore freely inclined to improper sexual relations, and her lack of moral character becoming generally known she was the victim of constant sexual relations with the boys and men of

the little village where she lived; that she became diseased, resulting in an epidemic of venereal disease in the locality.

The court has set forth sufficient of the testimony and of that portion of it which is practically uncontradicted to indicate that the determination of the board of examiners to cause the operation of vasectomy upon Frank Osborn is not justified either upon the facts as they to-day exist or in the hope of benefits to come.

The members of the board of examiners apparently know very little about the subject. They have given it no particular study. They are not, in the opinion of the court, justified in the determination which they have reached, and, therefore, upon review of the determination which the board has made, this court reverses the same.

The action above entitled was brought by Frank Osborn against the defendants, as members of the board of examiners, for an injunction restraining the board from causing to be performed an operation upon him to prevent procreation.

It is claimed that the law in question violates the Constitution of the United States in many respects; that it is a bill of attainder; that it is depriving citizens of a trial by jury; and also of the privileges or immunities to which citizens of other States are entitled; that it is compelling a citizen to be a witness against himself, and depriving him of life, liberty and property without due process of law; that it permits infliction of a cruel and unusual punishment; that it abridges the privileges and immunities of citizens in depriving persons of life, liberty and property without due process of law, and denying to persons within its jurisdiction the equal protection of law.

It is conceded that the proper form of raising the questions of unconstitutionality herein involved is by an action asking a permanent injunction.

A similar law has been declared unconstitutional by the Supreme Court of New Jersey in the case of Smith v. Board

of Examiners (88 Atl. Rep. 963), in an opinion written by Judge GARRISON.

The New Jersey statute gave to the board of examiners discretion to determine the form of operation most effective, as does the New York law.

It was thus given to the board to do almost anything which in their opinion would effectively destroy the power of procreation in Frank Osborn, or of any male or female feeble-minded inmate of a State hospital.

The statute seems to vest in the board the discretion to do what Judge GARRISON said of the New Jersey law: "The statute is broad enough to authorize an operation for the removal of any one (in the female) of these three organs, that is the ovary, the fallopian tube and the uterus, which are essential to procreation." The subject of the operation in the New Jersey case was an inmate of the State village for epileptics, and the New Jersey court said: "While the case in hand raises the very important and novel question whether it is one of the attributes of government to essay the theoretical improvement of society by destroying the function of procreation in certain of its members who are not malefactors against its laws, it is evident that the decision of that question carries with it certain logical consequences, having far-reaching results. For the feeble-minded and epileptics are not the only persons in the community whose elimination as undesirable citizens would or might in the judgment of the Legislature be a distinct benefit to society. If the enforced sterility of this class be a legitimate exercise of governmental power, a wide field of legislative activity and duty is thrown open to which it would be difficult to assign a legal limit."

Frank Osborn is not a malefactor. He is mentally deficient. He is deficient without personal responsibility for such defect. It must be assumed that he is poor in the sense that there are no parents or friends to give him a home and provide for him, and so he becomes a ward of the State, to be cared for and

treated and strengthened and developed, if possible. He is no different from many others, running no doubt into the thousands in our State who are not within the confines of a State institution, and who, taken together with those who are in institutions and similarly situated, mentally and physically, make up a large class of mentally deficient people.

Can it be said that the law can direct the physical mutilation of the bodies of those who are in the State's care, and not be concerned with the same class of persons who are in the world at large?

The laws of our State which have been sustained by our court as a proper exercise of the police power are not found to be a justification of this law.

The statute under consideration concerns certain classes of criminals as well as defectives. In the consideration of the question here we have properly confined our thoughts to the facts which have developed in the testimony, and those facts only relate to the feeble-minded.

The operation upon the feeble-minded is in no sense in the nature of a penalty, and therefore whether it is an unusual and cruel punishment is not involved.

The entire purpose of the enactment seems to be to save expense to future generations in the operation of eleemosynary institutions organized by the people of the State to care for those who are afflicted; the theory being that if the board of examiners should conclude that every feeble-minded inmate of a public institution should be operated upon either by the operation known as vasectomy or the more radical operation of castration, then the State would be justified in turning all the people of this class at large to find their own way, trusting that they in accordance with the theory of the law could no longer procreate; the State being thus relieved of their care during their lives and freed from the danger of the burden in the future of their abnormal offspring.

Such does not seem to this court to be the proper exercise of the police power. It seems to be a tendency almost inhuman in its nature. The subject of this inquiry is, according to the testimony of the physicians, physically strong. The same witnesses testify that if turned out into the world after or without the operation he could not care for himself or make a living; that at present, situated as he is, he works and helps the State in meeting the burden upon it in his care.

The last section of the statute under consideration provides that, " Except as authorized by this act, every person who shall perform, encourage, assist in or otherwise permit the performance of the operation for the purpose of destroying the power to procreate the human species or any person who shall knowingly permit such operation to be performed upon such person unless the same shall be a medical necessity, shall be guilty of a misdemeanor."

It seems clear that Frank Osborn is not given the equal protection of the laws, having in mind many others situated as he is who are not within the walls of a public institution, to which equal protection he is entitled with them. There is afforded to the young man similarly situated as to his physical and mental make-up, who is cared for by his parents in his own home, whose sexual tendencies and capacity may be the same as Osborn's, the protection of the law which makes it a misdemeanor for any person to assist or take part in the operation of vasectomy upon such a subject, while Frank Osborn, because he is an inmate of a State hospital, is not only not protected, but he is subject to such operation without his consent when determination is reached by the board created under this statute.

It seems, therefore, that the provisions of the Federal Constitution to which this law is offensive is that part of the Fourteenth Amendment which declares " that no State * * * shall deny to any person within its jurisdiction the equal protection of the laws."

The law certainly denies to some persons of a class and similarly situated the protection which is afforded to others of the same class.

The State has power, many times sustained by the courts, to protect the health, morals and welfare of the people, but such protection cannot be afforded unless it applies to all alike.

The courts have sustained the laws which prohibit the marriage contract between epileptics within certain ages, enacted for the same purpose and to accomplish the same end as the old law we are considering, but such laws thus sustained have related to all epileptics; they do not alone relate to the unfortunates within hospitals.

Our attention is called to an interesting and most readable opinion by the Attorney-General of California.

His conclusion is " as regards the castration of confirmed criminals and rapists, and those guilty of sexual crimes, I am of the opinion that these are grave constitutional questions," but " as restricted to the sterilization of the inmates of prisons and hospitals by the method of vasectomy, I am of the opinion that there are no legal inhibitions upon this enlightened piece of legislation which is an awakening note to a new era and a great advance toward that day when man's inhumanity to man will have acquired a meaning beyond mere frothy sentiment."

Why sterilization by vasectomy of patients in a hospital, who are grouped as a class with rapists in a State prison, strikes an awakening note in a new era and will lead to the day to which the Attorney-General so poetically refers, is beyond the comprehension of this court and is not enlightening.

Our conclusion is that the statute is unconstitutional and therefore invalid.

Judgment accordingly.