## SMITH v. WAYNE PROBATE JUDGE.

1. INSANE PERSONS — STERILIZATION OF FEEBLE-MINDED WITHIN POLICE POWER.

   Act No. 285, Pub. Acts 1923, authorizing the sterilization of feeble-minded persons, is a proper and reasonable exercise of the police power, and is justified by the findings of biological science that feeble-mindedness is hereditary.[1]

2. CRIMINAL LAW — CONSTITUTIONAL LAW — CRUEL AND UNUSUAL PUNISHMENT CLAUSE NOT APPLICABLE TO STERILIZATION OF FEEBLE-MINDED.

   The constitutional inhibition against cruel and unusual punishments (Art. 2, § 15) has reference only to punishments inflicted after convictions of crimes, and therefore has no application to the sterilization of feeble-minded persons under the provisions of Act No. 285, Pub. Acts 1923, which is nonpunitive.[2]

3. SAME—CRUEL AND UNUSUAL PUNISHMENT CLAUSE OF FEDERAL CONSTITUTION NOT APPLICABLE TO STATE LEGISLATURES.

   The provision in the Federal Constitution (8th Amendment), prohibiting cruel and unusual punishments, does not apply to State legislatures.[3]

4. INSANE PERSONS—STERILIZATION OF FEEBLE-MINDED NOT CRUEL OR OPPRESSIVE.

   The methods provided by Act No. 285, Pub. Acts 1923, for the sterilization of feeble-minded persons, requiring treatment by X-rays or the operation of vasectomy on males or salpingectomy on females, or other treatment as may be least dangerous to life, are not unreasonable, cruel, or oppressive.[4]

5. CONSTITUTIONAL LAW — STERILIZATION OF FEEBLE-MINDED NOT CLASS LEGISLATION.

   Section 7, subdiv. 1, Act No. 285, Pub. Acts 1923, providing for the sterilization of feeble-minded persons likely to procreate children with an inherited tendency to mental

---

[1]Insane Persons, 32 C. J. § 162 (Anno); [2]Criminal Law, 16 C. J. § 3191; Insane Persons, 32 C. J. § 162 (Anno); [3]Criminal Law, 16 C. J. § 3191; [4]Insane Persons, 32 C. J. § 162 (Anno).

For authorities discussing the question as to asexualization or sterilization of criminals or defectives, see notes in 41 L. R. A. (N. S.) 418; L. R. A. 1918D, 236.

defectiveness, unless closely confined or rendered incapable of procreation, where there is no probability of improvement, does not make an unconstitutional classification in that it excepts the insane, and therefore does not deny to the class upon which it operates equal protection of the laws.[5]

6. SAME—STERILIZATION OF ONLY THOSE FEEBLE-MINDED UNABLE TO SUPPORT CHILDREN CLASS LEGISLATION.

Section 7, subdiv. 2, of said act, providing for the sterilization only of those feeble-minded persons who are unable to support any children they might have, and whose children probably would become public charges, is subject to the constitutional objection that it is class legislation.[6]

7. STATUTES—VALID CLAUSE OF STATUTE NOT AFFECTED BY INVALIDITY OF ANOTHER CLAUSE.

Subdivision 1, § 7, Act No. 285, Pub. Acts 1923, being a complete classification in itself, its constitutionality is not affected by the invalidity of subdivision 2 of said section.[7]

8. CONSTITUTIONAL LAW—DUE PROCESS OF LAW CLAUSE NOT VIOLATED.

Act No. 285, Pub. Acts 1923, providing for the sterilization of feeble-minded persons, does not violate the "due process of law" clause of the Constitution, regular proceedings, with opportunity to defend, and right of appeal being provided for.[8]

9. INSANE PERSONS—CONSTITUTIONAL PROVISION FOR INSTITUTIONS FOR FEEBLE-MINDED NOT VIOLATED BY STERILIZATION ACT.

Act No. 285, Pub. Acts 1923, authorizing sterilization of feeble-minded persons, in no way violates the constitutional provision (Art. 11, § 15) that institutions for the benefit of the deaf, dumb, blind, feeble-minded or insane persons shall always be fostered and supported.[9]

10. SAME—ACT SHOWS INTENT FOR PROBATE COURT TO HAVE JURISDICTION IN STERILIZATION PROCEEDINGS.

Subdivision "d," § 3, of said act, sufficiently shows that the legislature intended the probate court to have jurisdiction to hear and determine cases relating to the sterilization of mental defectives under said statute.[10]

---

[5]Constitutional Law, 12 C. J. § 894; [6]Id., 12 C. J. § 855; Insane Persons, 32 C. J. § 162 (Anno); [7]Statutes, 36 Cyc. p. 976; [8]Constitutional Law, 12 C. J. § 987 (Anno); Insane Persons, 32 C. J. § 162 (Anno); [9]Insane Persons, 32 C. J. § 162 (Anno); [10]Id., 32 C. J. § 162 (Anno).

11. CONSTITUTIONAL LAW—STATUTE SHOULD BE HELD VALID UNLESS COURT SATISFIED "BEYOND RATIONAL DOUBT" OF ITS INVALIDITY.

The question whether the fact that defective mentality is of such character that children procreated by a person so afflicted will have an inherited tendency to mental defectiveness can be determined with reasonable certainty, being primarily for the legislature, where it is answered in the affirmative by the enactment of Act No. 285, Pub. Acts 1923, the court should be satisfied "beyond rational doubt" that said fact cannot be established by competent proof before declaring the statute void.[11]

12. INSANE PERSONS—STERILIZATION PROCEEDINGS—NOTICE MUST BE SERVED ON GUARDIAN AD LITEM.

Under Act No. 285, Pub. Acts 1923, a copy of the petition for the sterilization of a feeble-minded person must be served on the guardian *ad litem*, and where said service was impossible because the guardian was not appointed until after the hearing, the proceedings were void.[12]

13. SAME—PHYSICIANS APPOINTED MUST APPEAR IN COURT FOR EXAMINATION.

The filing of certificates made by the physicians appointed to examine a feeble-minded person whose sterilization has been petitioned for is unauthorized by the act, it being clearly the intent of the legislature that they shall appear in court at the hearing and submit to examination by the court, prosecuting attorney, and guardian or other person upon whom notice was served.[13]

14. SAME—QUESTION OF STERILIZATION FOR THE COURT AND NOT THE PHYSICIANS.

Whether a feeble-minded person should be sterilized under the provisions of the act is not for the physicians to determine, but is a question for the court.[14]

15. SAME—REQUIREMENT THAT COURT TAKE FULL EVIDENCE IN WRITING AT HEARING IS MANDATORY.

Section 6 of said act requiring the court to take full evidence in writing at the hearing as to the mental and physical condition of the adjudged defective and the history of his case is mandatory.[15]

16. SAME—STATUTORY PROCEDURE JURISDICTIONAL.

The requirements of the act as to the procedure to be

[11]Constitutional Law, 12 C. J. § 222; [12]Insane Persons, 32 C. J. § 162 (Anno); [13]Id., 32 C. J. § 162 (Anno); [14]Id., 32 C. J. § 162 (Anno); [15]Id., 32 C. J. § 162 (Anno).

followed in determining whether a feeble-minded person should be sterilized are jurisdictional, and no valid order may be made without a substantial compliance with them.[16]

BIRD, FELLOWS, and WIEST, JJ., dissenting.

Certiorari to Wayne Probate Court; Command (Edward), J. Submitted December 2, 1924. (Docket No. 3.) Decided June 18, 1925.

Petition by Percy L. Smith, under Act No. 285, Pub. Acts 1923, for the sterilization of Willie Smith, a feeble-minded person. Fred M. Butzell was appointed guardian *ad litem*. From an order granting the petition, said guardian brings certiorari. Reversed.

*William Van Dyke*, for appellant.

*Andrew B. Dougherty*, Attorney General, and *Fred L. Warner*, Assistant Attorney General, *amicus curiæ*.

MCDONALD, C. J. Willie Smith is 16 years of age. He was duly adjudged to be feeble-minded by the probate court of Wayne county, and is now confined in the State home at Lapeer. His father, with the consent of the mother, filed a petition under Act No. 285, Pub. Acts 1923, to have him sterilized. The proceedings resulted in an order by the court appointing a competent physician to treat the plaintiff by X-ray or by vasectomy, or by other treatment that may be least dangerous to life, in order to render him incapable of procreation. To secure a reversal of this order the plaintiff brings certiorari.

The purpose of the act as expressed in its title, is "to authorize the sterilization of mentally defective persons." Mentally defective persons are deemed to include idiots, imbeciles and the feeble-minded, but not

[16]Insane Persons, 32 C. J. § 162 (Anno).

the insane. When one of this class has been adjudged mentally defective by a court of competent jurisdiction, application may be made to have him treated so that he may be incapable of procreation. Upon filing the application the court is required to fix a day for hearing, to cause a ten-day notice thereof to be given, to appoint a guardian *ad litem* and to name three reputable physicians to examine into the mental condition of the defective with a view to obtaining their opinions as to whether he should be dealt with under the act. At the hearing, which may be by the court alone or by the court and a jury, full evidence is required to be taken in writing as to the mental and physical condition of the defective and as to his personal history. After such hearing the court may make an order for treatment or operation to render the defective incapable of procreation whenever it shall be found:

"1. (*a*) That the said defective manifests sexual inclinations which make it probable that he will procreate children unless he be closely confined, or be rendered incapable of procreation;

"(*b*) That children procreated by said adjudged defective will have an inherited tendency to mental defectiveness; and

"(*c*) That there is no probability that the condition of said person will improve so that his or her children will not have the inherited tendency aforesaid; or

"2. (*a*) That said defective manifests sexual inclinations which make it probable that he will procreate children unless he be closely confined, or be rendered incapable of procreation; and

"(*b*) That he would not be able to support and care for his children, if any, and such children would probably become public charges by reason of his own mental defectiveness." Act No. 285, Pub. Acts 1923, § 7.

The question presented for our consideration is whether this act is a valid exercise of police power within the limitations of the Constitution.

It is first urged by counsel for the plaintiff that the act is an unreasonable, arbitrary and unnecessary interference with the fundamental rights and privileges of individuals, that its effect upon the person or upon the public welfare is experimental, and that courts cannot sustain it as a valid exercise of police power until science or experience has demonstrated its reasonableness. Biological science has definitely demonstrated that feeble-mindedness is hereditary. The English royal commission of 1904 took the testimony of all the noted experts of England on the subject of mental diseases. The consensus of opinion thus gathered was that feeble-mindedness, if not accidental, is hereditary. It would not be advisable to extend this opinion by repeating the testimony of these eminent biological and medical experts. We may content ourselves with quoting from Dr. A. F. Tredgold, one of the greatest authorities on feeble-mindedness, who, after reviewing the findings of the royal commission, says:

"It is quite clear, therefore, that there is now an overwhelming body of evidence from those qualified by experience to express an opinion on this matter, to the effect that in the great majority of cases of *amentia* (feeble-mindedness) the condition is due to innate or germinal causes, and that it is transmissible." Mental Deficiency, Edition of 1916, by Dr. A. F. Tredgold.

To the same effect are the opinions of many notable biological students in this country. In the "Trend of the Human Race," by Samuel J. Holmes of the University of California, it is said:

"The fact that defective mentality is strongly transmitted is established beyond the possibility of sane objection, and the particularly disastrous results that are pretty sure to follow from the mating of two mentally defectives have certainly been made sufficiently impressive by the work of recent investigators."

From this and a great quantity of other evidence to

which we will not here refer, it definitely appears that science has demonstrated to a reasonable degree of certainty that feeble-mindedness is hereditary. This fact, now well known, with its alarming results, presents a social and economic problem of grave importance. It is known by conservative estimate that there are at least 20,000 recognized feeble-minded persons in the State of Michigan. Eight times as many as can be segregated in State institutions. The Michigan home and training school at Lapeer is full to overflowing with these unfortunates, and hundreds of others are on the waiting lists. That they are a serious menace to society no one will question.

In view of these facts, what are the legal rights of this class of citizens as to the procreation of children? It is true that the right to beget children is a natural and constitutional right, but it is equally true that no citizen has any rights superior to the common welfare. Acting for the public good, the State, in the exercise of its police powers, may always impose reasonable restrictions upon the natural and constitutional rights of its citizens. Measured by its injurious effect upon society, what right has any citizen or class of citizens to beget children with an inherited tendency to crime, feeble-mindedness, idiocy or imbecility? This is the right for which Willie Smith is here contending. It is a right which this statute, enacted for the common welfare, denies to him. The facts and conditions which we have here related were all before the Michigan legislature. Under the existing circumstances it was not only its undoubted right, but it was its duty to enact some legislation that would protect the people and preserve the race from the known effects of the procreation of children by the feeble-minded, the idiots and the imbeciles.

Thus far we have been attempting to show that this statute, measured by the purpose for which it was

enacted and the conditions which warranted it, and justified by the findings of biological science, is a proper and reasonable exercise of the police power of the State. The next question that naturally follows is whether the means provided by the statute to carry out its object are so cruel, inhuman, unreasonable and oppressive, that the legislature has no constitutional right to enforce them.

It is claimed that the statute violates section 15, art. 2, of the Constitution, which provides that "cruel or unusual punishment shall not be inflicted." The only purpose of this constitutional provision is to place a limitation on the power of the legislature in fixing punishment for crimes. There is no element of punishment involved in the sterilization of feeble-minded persons. In this respect it is analogous to compulsory vaccination. Both are nonpunitive. It is therefore plainly apparent that the constitutional inhibition against cruel or unusual punishment had no application to the surgical treatment of feeble-minded persons. It has reference only to punishments inflicted after convictions of crimes. The provision in the Federal Constitution (8th Amendment), quite similar in its language, does not apply to State legislatures. *Weems* v. *United States,* 217 U. S. 349 (30 Sup. Ct. 544, 19 Ann. Cas. 705), and cases referred to therein. The following cases, cited to sustain the claim that the act is in violation of the above provision, do not justify the conclusion reached.

In *Re Thomson,* 169 N. Y. Supp. 638 (affirmed without opinion in 185 App. Div. 902), it is said:

"The operation upon the feeble-minded is in no sense in the nature of a penalty, and therefore whether it is an unusual and cruel punishment is not involved."

In *Davis* v. *Berry,* 216 Fed. 413, the act in question required the performance of an operation on criminals

who had been convicted of a felony. It in no way referred to feeble-minded persons.

In *Smith* v. *Board of Examiners,* 85 N. J. Law, 46 (88 Atl. 963), it was held that an act violated the 14th Amendment, which secures to all persons "the equal protection of the laws." The statute applied also to the feeble-minded, but the court said that as the prosecutrix was an epileptic it was not concerned with the criminal aspect of the act.

In *Mickle* v. *Henrichs,* 262 Fed. 687, the act in terms applied only to persons convicted of rape upon a female child under the age of ten years.

In *State* v. *Feilen,* 70 Wash. 65 (126 Pac. 75, 41 L. R. A. [N. S.] 418, Ann. Cas. 1914B, 512), the statute was somewhat similar to that considered in *Davis* v. *Berry, supra.* It in no way referred to feeble-minded persons.

But the methods provided by the statute to accomplish its purpose are not cruel or inhuman. It requires treatment by X-rays or the operation of vasectomy on males or salpingectomy on females, or other treatment as may be least dangerous to life. These operations are the least radical known to medical science. None of them requires the removal of any of the organs or sex-glands, the result being accomplished by a severance of the sex-germ carrying ducts. The operation does not destroy sexual desires or capacity for sexual intercourse, but renders procreation impossible. In 2 Penal and Reformatory Institutions, prepared for the Eighth International Prison Congress, Russell Sage Foundation, Dr. Sharp, surgeon of the reformatory at Jeffersonville, Indiana, speaking of vasectomy says:

"This operation is indeed very simple and easy to perform. I do it without administering an anæsthetic either general or local. It requires about three minutes time to perform the operation and the subject

returns to his work immediately, suffering no inconvenience and is in no way impaired for the pursuit of life, liberty and happiness, but is effectively sterilized. I have been doing this operation for over nine years. I have 456 cases that have afforded splendid opportunity for post operative observation, and I have never seen any unfavorable symptoms.

"After observing nearly 500 males, in whom I have severed the *vas deferens*, I am prepared to state that there is not only a diminution of the muscular and nervous fatigue, resulting from muscular exertion, but also a lessening of fatigue sensation and a decided increase of well being. I have observed splendid results in cases of neurasthenia."

By another authority it is said:

"Vasectomy is a very simple operation, which is accompanied by very little shock, and may be performed without an anæsthetic, although most surgeons advise that it be done under local anæsthesia. Its pain without an anæsthetic has been compared by men who were vasectomized to that experienced in the extraction of a tooth."

Salpingectomy is recommended as the best available method for the sterilization of females. It is a more serious operation than vasectomy, but is safely and effectively performed by the skillful surgeon. 3 Surgical Treatment (Warbasse), p. 429.

As to the X-ray treatment, Dr. Arthur C. Christie, president of the American Roentgen Ray Society, says that, "no physiological dangers accompany the proper application of X-rays for effecting sterility."

It is clearly apparent, therefore, that the methods provided by the statute for carrying out its purpose are not unreasonable, cruel or oppressive, and that the results are beneficial both to the subject and to society.

It is further urged by counsel that the statute makes an unconstitutional classification, that it excepts the insane, that it does not apply to all mental defectives,

and thus denies to the class upon which it is intended to operate their constitutional right to equal protection of the laws. In discussing this question we will follow the order in which the classification is made by the statute. Section 7 makes two separate and distinct divisions to which the act is made applicable.

"1. (*a*) That the said defective manifests sexual inclinations which make it probable that he will procreate children unless he be closely confined, or be rendered incapable of procreation;

"(*b*) That children procreated by said adjudged defective will have an inherited tendency to mental defectiveness; and

"(*c*) That there is no probability that the condition of said person will improve so that his or her children will not have the inherited tendency aforesaid.

"2. (*a*) That said defective manifests sexual inclinations which make it probable that he will procreate children unless he be closely confined, or be rendered incapable of procreation; and

"(*b*) That he would not be able to support and care for his children, if any, and such children would probably become public charges by reason of his own mental defectiveness."

"It is elementary that legislation which, in carrying out a public purpose for the common good, is limited by reasonable and justifiable differentiation to a distinct type or class of persons is not for that reason unconstitutional because class legislation, if germane to the object of the enactment and made uniform in its operation upon all persons of the class to which it naturally applies; but if it fails to include and affect alike all persons of the same class, and extends immunities or privileges to one portion and denies them to others of like kind by unreasonable or arbitrary subclassification, it comes within the constitutional prohibition of class legislation." *Haynes* v. *Lapeer Circuit Judge,* 201 Mich. 138 (L. R. A. 1918D, 233).

Applying the tests announced by Mr. Justice STEERE to the first division of the classification, it would seem clear that it is not unconstitutional as class legislation.

It is germane to the object of the enactment, the common good. It is made uniform upon all persons of the class to which it naturally applies. It is a reasonable classification because it applies to a class of feeble-minded persons who are a menace to the public welfare. In making this classification the legislature did not carve a class out of a class, but took a natural class of defectives whose children will have an inherited tendency to feeble-mindedness. It is as reasonable and no more class legislation than the compulsory vaccination of those who have been exposed to smallpox. The feeble-minded include distinct types of which the imbeciles and idiots are lower orders. The legislature took one of these natural classes and applied the law to all members alike. The insane do not belong in this class and there are apparent good and substantial reasons why the legislature differentiated between them. While we do not know, of course, what the legislature had in mind, it is reasonable to suppose that they knew that the insane have less of the sexual impulses than the feeble-minded, and that biological science has not so definitely demonstrated their inheritable tendencies. We think the classification made in the first division of section 7 of the statute is not arbitrary or unreasonable, and that in this respect it does not offend the constitutional provision which gives to every person equal protection of the laws.

The second division of the classification in section 7 presents a different situation. It brings within the operation of the law only those of the feeble-minded class who are unable to support any children they might have and whose children probably will become public charges by reason thereof. The evident purpose of the legislature in enacting the second division was to protect the public from being required to support the children of mentally defective persons.

In attempting to do so, an element inconsistent with the beneficial purpose of the statute was introduced. It is not germane to the object of the enactment as expressed in its title. It carves a class out of a class. In that it does not apply to those of the class who may be financially able to support their children, it is not made applicable alike to all members of the class. We think that it is subject to the constitutional objection discussed by Justice STEERE in *Haynes* v. *Lapeer Circuit Judge, supra,* and by Justice SHARPE in *Peninsular Stove Co.* v. *Burton,* 220 Mich. 284.

As the first division of section 7 is a complete classification in itself, its constitutionality is not in any way affected by that of the second.

Nor does this statute violate the "due process of law" clause of the Constitution. It requires ample notice of the time and place of hearing by personal service not only on the alleged defective but upon the prosecuting attorney of the county, upon the relatives, father, mother, wife or child of the defective, or upon the person with whom he resides, or at whose house he may be; and in case no relatives can be found service is required upon a guardian *ad litem* appointed by the court to receive such notice and to represent the defective at the hearing. Regular proceedings are followed and opportunities to defend with the right of appeal are provided. Nothing further is required by the "due process of law" clause of the Constitution.

It is further urged that the statute is a violation of article 11, § 15, of the State Constitution, which reads as follows:

"Institutions for the benefit of those inhabitants who are deaf, dumb, blind, feeble-minded or insane shall always be fostered and supported."

This constitutional provision, that institutions for the benefit of the feeble-minded "shall always be fostered and supported" is in no way controlling of

the question before us. Many people believe that the most effective way of accomplishing the result aimed at is by segregation. The legislature, in pursuance of the constitutional provision, has established a home for the feeble-minded at Lapeer. In its opinion, as evidenced by this statute, additional legislation was needed to prevent the spread of feeble-mindedness among our people. In terms it specifically applies to inmates of such institutions. Its provisions in no way violate either the letter or spirit of this provision of the Constitution.

Further objection is made to the statute because it does not provide what court shall have jurisdiction of the cases to be brought under it. While this is not done in the regular way, we think subdivision (*d*) of section 3 sufficiently shows that the legislature intended the probate court, before which all matters pertaining to mental defectives are usually heard, to have jurisdiction to hear and to determine cases to be dealt with by this statute.

The other objections urged against the statute by counsel for the plaintiff in his very able and exhaustive brief we have considered, but as they clearly appear to be without merit we do not discuss them.

Our attention is called to the recorded decisions of other States where sterilization laws have been held to be unconstitutional. In most of them there was a plain and unreasonable violation of constitutional rights. But an examination of these cases will show that the great weight of authority supports the right of the State in the exercise of its police power to enact reasonable legislation for the sexual sterilization of certain natural classes of mental defectives and degenerates.

In examining the recorded decisions of other jurisdictions, we have read the sterilization statutes of 10 States. In most of them the matter of determining

whether a defective shall be dealt with under the act is left to an administrative officer or board. In the Michigan statute that matter is left to court procedure and judicial determination, aided by the expert knowledge of three competent physicians. The distinguishing feature of our statute is found in these provisions and in the safeguards which it throws around those of the class who have not the inherited tendencies which bring them within the operation of the law. It provides for a jury trial and the right of appeal. It requires all testimony to be taken in writing and a complete record made, so that it may be reviewed.

In the operation of this statute the only serious question, as we view it, is whether the fact that defective mentality is of such a character and due to such causes that children procreated by a person so afflicted will have an inherited tendency to mental defectiveness, can be determined with reasonable certainty. Primarily, this question was for the legislature, and they have answered it in the affirmative by the enactment of the statute. As was said in *Adkins* v. *Children's Hospital,* 261 U. S. 525, 544 (43 Sup. Ct. 394, 24 A. L. R. 1238):

"The judicial duty of passing upon the constitutionality of an act of congress is one of great gravity and delicacy. The statute here in question has successfully borne the scrutiny of the legislative branch of the government which, by enacting it, has affirmed its validity; and that determination must be given great weight."

After referring to the "unbroken line of decisions" holding "that every possible presumption is in favor of the validity of an act of congress until overcome beyond rational doubt," it is said:

"But if by clear and indubitable demonstration a statute be opposed to the Constitution we have no choice but to say so."

Many of our Michigan cases announcing a similar rule will be found cited in *Moore* v. *Harrison*, 224 Mich. 512, 515.

To answer the question suggested in the negative, we must be satisfied "beyond rational doubt" that the facts which under the statute must be found to exist by the probate court to justify the making of an order for sterilization cannot be established by competent proof. If the proofs submitted be insufficient, he should, of course, refuse to make the order.

That feeble-mindedness is hereditary in certain cases, there can be no doubt. While a difference of opinion undoubtedly exists as to whether the condition of feeble-mindedness in a particular person is such that it is reasonably certain his children will, or will not, be affected thereby, we are of the opinion that the weight of authority, as evidenced by scientific writings and reports, are convincing that it may be so determined. We can at least say that we are not convinced to the contrary "beyond rational doubt."

In comparison, our statute is much more reasonable and conservative than the laws of other States. Yet those States, with less perfect laws on the subject, have found that in their practical working out they have been satisfactorily beneficial both to the person and to society. California, a pioneer State in the matter of sexual sterilization, during the period between 1907 and 1921, sterilized 2,558 persons. During the same period, under the various statutes, a total of 3,233 persons were sterilized in the United States. Of these 1,853 were males operated on by vasectomy and 1,380 were females operated on by salpingectomy. See Laughlin's Statistical Summary in "Eugenical Sterilization in the United States." These statistics are referred to in refutation of the claim that our law is an experiment.

The Michigan statute is not perfect. Undoubtedly

time and experience will bring changes in many of its workable features. But it is expressive of a State policy apparently based on the growing belief that, due to the alarming increase in the number of degenerates, criminals, feeble-minded and insane, our race is facing the greatest peril of all time. Whether this belief is well founded is not for this court to say. Unless for the soundest constitutional reasons, it is our duty to sustain the policy which the State has adopted. As we before have said, it is no valid objection that it imposes reasonable restraints upon natural and constitutional rights. It is an historic fact that every forward step in the progress of the race is marked by an interference with individual liberties.

Except as to the second division of section 7, this statute should be sustained as a reasonable exercise of the police powers of the State within the limitations of the Constitution.

While sustaining the statute as a valid exercise of the police power vested in the legislature, we are of the opinion that the order made by the defendant should be set aside because the statutory proceedings were not followed. The return to the writ states that all of the records and proceedings in the probate court are fully set forth in the petition for the writ. The calendar entries are annexed. The petition to the probate court was filed on December 28, 1923. The physicians were at that time appointed, and an order fixing January 24, 1924, for hearing was made. On that day, the certificates of the physicians were filed and the hearing continued until February 14th, on which day the petition was "heard and submitted." On April 14th, two months thereafter, Mr. Butzel was appointed guardian *ad litem.* On the 19th he filed objections to the making of the order for sterilization. It was made on April 21st.

There was no such substantial compliance with the statute as conferred jurisdiction upon the court to make the order. It contains specific provisions as to the procedure in such cases. When the petition is filed, an order of hearing shall be made and served as directed in section 4. A copy must be served on the guardian *ad litem*. Clearly, the guardian must be appointed when the order of hearing is made.

There is no provision for the filing of certificates made by the physicians. The procedure is in no way similar to that provided for on petitions to commit to an insane asylum (1 Comp. Laws 1915, § 1325). Section 5 provides:

"The court shall cause the defective to be examined by three reputable physicians * * * with a view to obtaining the opinion of said physicians on the question whether the adjudged defective should be dealt with under the terms of this act."

The intent is clear that the physicians shall appear in court at the hearing and submit to an examination by the court, the prosecuting attorney, the guardian or other person upon whom notice has been served. The certificates filed in this case are simply statements in the language of the statute that the facts are present which the court must find to warrant the making of the order. It is not for the physicians to determine the question before the court. While, of course, they may express their opinions concerning it, the reasons for such opinions should be inquired into in order that the court may, after due consideration thereof and of the other proof submitted, as provided for in section 6, determine whether the person examined should be dealt with under the terms of the act.

Section 6 reads:

"The court shall take full evidence in writing at the hearing as to the mental and physical condition of the adjudged defective and the history of his case." * * *

No witnesses were examined. This provision is mandatory, and must be complied with.

No more important duty devolves on a probate judge than that imposed on him under this act. The responsibility of determining that a surgical operation shall be performed on a human being who is mentally defective "for his own welfare or the welfare of the community" rests upon him, and it may properly be discharged by him only on the most painstaking and thorough investigation of the facts disclosed upon the hearing. The requirements of the statute above referred to are jurisdictional, and no valid order can be made without a substantial compliance with them.

It follows that the order made will be vacated and set aside.

SHARPE, MOORE, and STEERE, JJ., concurred with MCDONALD, C. J.

CLARK, J. (*concurring*). Before a defective may be made to suffer sterilization, it must be found that he or she is a subject to be dealt with under the act and, particularly (quoting from subdivision 1 of section 7 of the act):

"(*a*) That the said defective manifests sexual inclinations which make it probable that he will procreate children unless he be closely confined, or be rendered incapable of procreation;

"(*b*) That children procreated by said adjudged defective will have an inherited tendency to mental defectiveness; and

"(*c*) That there is no probability that the condition of said person will improve so that his or her children will not have the inherited tendency aforesaid."

These findings must be based on evidence adduced, not on conjecture or speculation. As pointed out by counsel for plaintiff, paragraph (*a*) above quoted may be satisfied by evidence that the subject is either male or female. If a finding can be made under paragraph

(*b*), a finding can be made under paragraph (*c*). But what of paragraph (*b*)? Can it be determined as a scientific fact upon competent evidence that a child not in being, but to be procreated, "will have an inherited tendency to mental defectiveness?"

A prominent Michigan educator states:

> "I do not believe that the question of the constitutionality of such acts can be correctly determined until our biologists can give some certain, conclusive answer upon the scientific problem involved."

I have grave doubts that paragraph (*b*) is capable of proof, and before sterilization can be ordered, such finding must be made, and it must be based upon evidence. But doubts should be resolved in favor of the validity of the act. With reluctance I have concluded to concur in the result reached by Chief Justice MCDONALD.

WIEST, J. (*dissenting*). This act violates the Constitution, goes beyond the police power, and is void. I am wholly at variance with the theories sanctioned by the Chief Justice. The bodies of citizens may not, under legislative mandate, be cut into and power of procreation destroyed by ligation or mutilation of glands or carving out of organs. It is not my purpose to trench upon legislative prerogative, neither shall I hesitate to view the whole subject involved in this claimed exercise of the police power. Conceding the power of government to protect society from the evils of preventable human deterioration, I cannot agree that this power extends to the mutilation of the organs or glands of generation of citizens or any class thereof. The power to segregate exists and the protection afforded thereby is ample. There is a mandate in the Constitution of this State, humanitarian in purpose, and repressive of procreation by social inadequates, through segregation. It is:

"Institutions for the benefit of those inhabitants who are deaf, dumb, blind, *feeble-minded* or insane shall always be fostered and supported." Const. Art. 11, § 15.

Under the sterilization act no one may suffer the operation unless and until adjudged defective within the meaning of another statute enacted to carry out the humanitarian mandate of the Constitution. In other words, the victims of sterilization must be wards of the State, and judicially found to be proper subjects to receive the benefit of institutions required to be fostered and maintained by the State. Sterilization of such wards, to avoid segregation, is in violation of the mandate of the Constitution. As soon as an unfortunate is adjudged a ward of the State, he has a right to the benefit of the public institutions required to be fostered by the State, and may not be sterilized as a condition to his going at large. Surely, no one can successfully maintain that it is essential for the public safety or welfare to sterilize the unfortunates so segregated.

In Eugenics Record Office, Bulletin No. 10B, it is stated:

"No matter how inferior the hereditary qualities of an individual might be, there would be no object, under modern institutional management, in sterilizing *for eugenical purposes* an individual who is not to be released. It is sufficient, therefore, to provide for sterilization only in case the potential parent of defectives is about to be returned to society at large."

If the purpose is to sterilize in order to let them go at large (and this is the purpose), then the mandate is circumvented for pecuniary reasons and the feeble-minded have not the benefit of institutions for their amelioration, fostered and supported by the State. This provision with reference to the feeble-minded appears for the first in the Constitution of 1908. This act violates not only the spirit but the very letter of

the constitutional provision, and that for reasons too sordid to merit enlightened consideration. Due process of law demands judicial determination of a mental condition requiring wardship by the State, and at such point the constitutional provision steps in, and commands aid and care and forbids the substitution of sterilization in place thereof. When pity and mercy and humanitarianism are subordinated to utilitarian considerations and power of the State is employed to destroy the virility of unfortunate human beings rather than their segregation and treatment toward recovery or amelioration, we as a people invite atavism to the state of mind evidenced in Sparta, ancient Rome and the dark ages where individuality counted for naught against the mere animal breeding of human beings for purposes of the State or tribe. Sparta is but a memory. The glory of Rome has departed. There is a limit even to the power of the State over the bodies of men and women. Are we approaching the period imagined by Plato, in his Ideal Republic, when he said:

"You will establish, then, in your State the science of medicine such as we have described, and along with it a corresponding system of judicature, both of which together may carefully provide for such of your citizens as are naturally well disposed both in body and mind; while as regards the opposite, such as are diseased in their bodies, they should let die, but as for those who are thoroughly evil and incurable as to the soul these they are themselves to put to death? It seems, at any rate, the best, said he, that can happen, both for those who are thus afflicted and for the State itself." Book 3, chapter 17.

An author in the Virginia Law Review restates the stock argument:

"We bestow care upon the breeding of our chickens, horses and cattle; is not the human being worthy of equal care?"

This is but a repetition of the wail of Theognis in the sixth century before the Christian era. He said:

"With kine and horses, Kurnus! we proceed
By reasonable rules, and choose and breed
For profit and increase, at any price;
Of a sound stock, without defect or vice.
But, in the daily matches that we make,
The price is everything; for money's sake
Men marry; women are in marriage given:
The churl or ruffian that in wealth has thriven
May match his offspring with the proudest race:
Thus everything is mix'd, noble and base!
If then in outward manner, form, and mind,
You find us a degraded, motley kind,
Wonder no more, my friend! the cause is plain,
And to lament the consequence is vain."

Poor old Archidamus ran contrary to the Spartan breeding idea and was fined for having married a diminutive wife. Diodorus Siculus in his history stated that in Ceylon:

"Those that are lame, or have any other weakness or infirmity of body (according to the severe law of their country) are put to death." Book 2, chap. 4.

And he gives the reason why the "Troglodites" were all of sound and strong bodies:

"All the Troglodites are circumcised like the Egyptians, except those who by reason of some accident are called cripples; for these only, of all those that inhabit these streights, have from their infancy that member (which in others is only circumcised) wholly cut off with a razor."

He said they killed the aged and made it lawful to put to death any that became lame or seized with any desperate and incurable distemper.

"For they count it the highest and greatest offense for any one to love his life when he is able to do nothing worth living. And therefore all the Troglodites are of sound bodies and of a strong and healthful age, none exceeding three score." Book 3, chap. 2.

Of course!

Law 3, Table 4, Twelve Tables of Rome, provided:

"If a father has a child born, which is monstrously deformed, let him kill him immediately.'

This inhuman law was evidently deemed eugenistically essential to the welfare of the Roman republic. It was eugenics, in infancy, bent on the survival of the fittest. We shudder at the cruelty of the ancients, practiced upon the helpless, the deformed and the aged, and some who shuddered are inclined to revert to old time cruelties because sugar-coated with a scientific name and heralded as a new thing under the sun. The subject of eugenics is as old as history, and there runs a suspicion that one prime purpose was to save bother and expense.

This act also violates the Constitution in the sense pointed out in *Haynes* v. *Lapeer Circuit Judge,* 201 Mich. 138 (L. R. A. 1918D, 233), where this court held a previous sterilization act a violation of the constitutional prohibition against class legislation. What class under the provisions of this act are subject to sterilization? Mentally defective persons, inclusive of idiots, imbeciles and the feeble-minded, but not insane persons. Is there delimitation? Yes. The feeble-minded by heredity, adjudged capable of procreation, with tendency of transmission of mental defectiveness, and with no probability of improvement to the elimination of such tendency, fall within the act. This, then, exempts all except those coming before a court, and of those, such as will not probably procreate, and those whom probability, based on medical guess, grants the tender mercy of possible failure to transmit the defective germ plasm. If the feeble-minded manifests an inclination to procreate children he will probably not be able to support, he is subject to mutilation. This class bears no relation to heredity, and carves a class out of a class, condemns

the poor and protects the rich. I shall touch this question again.

This act violates the provision of the Constitution prohibiting cruel and unusual punishment and the inherent right of bodily integrity. In examining the subject of cruel and unusual punishments I have been surprised at the dearth of adjudications. This fact, however, speaks well for American legislation. It must be assumed that the framers of the Bill of Rights had knowledge of former cruel and unusual punishments, whether adjudged under some law or imposed by despotic and arbitrary power. They knew of quartering, of slitting the nose and cropping the ears, of nailing the tongue to a post, of crucifixion, of flogging at the cart's tail, of disemboweling, cutting off hands and of branding, of castration, of burning, of *peine forte et dure,* of the rack and thumbscrews, etc., and they emphatically said, "Never again."

They looked at all past cruelties, and in a few comprehensive words prohibited recurrence thereof, and also kindred cruelties invented in the future. Old forms of cruelty were outlawed and new forms prohibited. They struck at the evil evidenced in man's inhumanity in the past and placed a bar at any renewal thereof, whether in the name of science or penology, eugenics or human procreation regulation by mutilation. They did something more than condemn the cruelties of the past (common decency had done that); they provided future protection, not alone from what had been done by savages vested with authority, but as well all new forms of cruelty, good or bad intentioned, and all old forms disguised under new scientific names and theories and pressed with the zeal and intolerance of converts obsessed with the fallible wisdom of questionable opinions.

Emasculation was a penalty sometimes exacted for rape. The laws of Alfred prescribed that a male

*theow* (serf or bondsman) who commits a rape upon a female *theow* shall be emasculated. Laws of Alfred, 2, 25. Cited by Westermarck, Origin and Development of the Moral Ideas, Vol. 2, p. 521.

In Bracton's De Legibus Et Consuetudinibus Angliae, Vol. 2, p. 481, it is stated:

"There is amongst other appeals a certain appeal, which is called concerning the rape of virgins." * * *

Castration was the punishment.

Henry II made it treason for any person to bring over any mandate from the Pope or any one in authority in church affairs. This he made punishable as to secular clergymen by the loss of their eyes and by castration. 1 Goldsmith's History of England, p. 88, cited in *Davis* v. *Berry*, 216 Fed. 413.

In *Weems* v. *United States*, 217 U. S. 349 (30 Sup. Ct. 544, 19 Ann. Cas. 705), the Federal constitutional interdict of cruel and unusual punishment was given exhaustive consideration. The old time barbarity of castration was mentioned. It was stated that Patrick Henry and those who believed as he did would take no chances without a bill of rights:

"Their predominant political impulse was distrust of power, and they insisted on constitutional limitations against its abuse. But surely they intended more than to register a fear of the forms of abuse that went out of practice with the Stuarts. Surely, their jealousy of power had a saner justification than that. They were men of action, practical and sagacious, not beset with vain imagining, and it must have come to them that there could be exercises of cruelty by laws other than those which inflicted bodily pain or mutilation. With power in a legislature great, if not unlimited, to give criminal character to the actions of men, with power unlimited to fix terms of imprisonment with what accompaniments they might, what more potent instrument of cruelty could be put into the hands of power? And it was believed that power might be tempted to cruelty. This was the motive of the clause, and if we are to attribute an intelligent

providence to its advocates we cannot think that it was intended to prohibit only practices like the Stuarts, or to prevent only an exact repetition of history. We cannot think that the possibility of a coercive cruelty being exercised through other forms of punishment was overlooked. We say 'coercive cruelty,' because there was more to be considered than the ordinary criminal laws. Cruelty might become an instrument of tyranny; of zeal for a purpose, either honest or sinister."

After reviewing the subject the court further stated:

"Other cases might be cited in illustration, some looking backwards for examples by which to fix the meaning of the clause; others giving a more expansive and vital character to the provision, such as the President of the United States thought it possessed and admonished the Philippine commission that it possessed as 'essential [with other rights] to the rule of law and the maintenance of individual freedom.' "

We have found no case in the books holding that in a Christian civilization it is neither cruel nor unusual to emasculate the feeble-minded. It has remained for the civilization of the twentieth century to write such a law upon the statute book.

Even savages have had more consideration for idiots. See 1 Keating's Expedition to the Source of St. Peter's River, p. 100.

In *Whitten* v. *State*, 47 Ga. 297, it was stated, the provision in the Constitution inhibiting cruel and unusual punishments was, "doubtless, intended to prohibit the barbarities of quartering, hanging in chains, castration, etc."

We will not interfere with legislative power; we are concerned, however, with the limitations on legislative power. The power of the Constitution invoked by an oppressed citizen awakes upon call, casts aside all lethargy and responds with vigor in exacting obedience from every power of government. It would be a reproach to the law to say that this pro-

tection of the Constitution is for criminals only and no safeguard to the mentally unfortunate by birth, by traumatism, or psychosis resulting from sickness or disease, who have committed no offense except to possess power of procreation. I refuse to believe that this humane inhibition exists for the protection of criminals and bears no relation to the forcible mutilation of the generative organs of the mentally unfortunate. It was in the pledge exacted of William and Mary when they were tendered the throne of England in 1688, and its splendor of purpose should not be dimmed by a holding that it protects criminals alone; that it is cruel and unusual punishment to castrate malefactors, but not so in the name of the police power to castrate the victims of inherited, accident induced, or disease occasioned feeble-mindedness.

Magna Charta was no grant of rights to English subjects; it was a pledge exacted for the observance of existing rights. The Bill of Rights of 1688 was no grant of rights; it was a declaration of existing rights and exacted observance thereof. Bills of Rights in American Constitutions are not grants of rights to the creators thereof nor do they measure the rights of the governed; they declare *some* inherent rights, superior to the police power, and inhibit violation thereof. The inherent right of mankind to pass through life without mutilation of organs or glands of generation needs no declaration in constitutions, for the right existed long before constitutions of government, was not lost or surrendered to legislative control in the creation of government, and is beyond the reach of the governmental agency known as the police power. The Constitution does not say in express terms that my hands shall not be cut off or my eyes destroyed, and yet the inhibition against the use of the police power to such an end exists.

The inherent inhibition against cruel and unusual infliction of bodily injuries upon citizens runs with the Constitution and the express provision was one to carry the protection to all persons and not alone to criminals. Under the authority of *Smith* v. *Board of Examiners,* 85 N. J. Law, 46 (88 Atl. 963); *Osborn* v. *Thomson,* 169 N. Y. Supp. 638; *Davis* v. *Berry,* 216 Fed. 413 (reversed on other grounds, 242 U. S. 468 [37 Sup. Ct. 208]); *Mickle* v. *Henrichs,* 262 Fed. 687, this act is in violation of the constitutional provision inhibiting cruel and unusual punishments and the inherent right to full bodily integrity.

My Brother states that biological science has definitely demonstrated that feeble-mindedness is hereditary. To understand this asserted law of heredity it seems necessary to enter upon a study of the origin of some of the many theories it seeks to carry out. This heralded revelation of heredity, in its modern acceptation by some, lay sealed until an Austrian monk, in experimenting with high-vine and low-vine peas in 1865, it is said, solved the riddle, and even then the great medical profession did not recognize the significance of his pastime, until 1900, and he died with praises unsung, but his old garden is now a mecca for disciples, and his praise is raised in season and out, and his little idea has spread and been amplified by theories of his followers to the unraveling of mysteries, even to the imagined finding of the reason for the fall of nations. This poor monk, however, would not recognize his discovery in its present Gargantuan proportions. The Mendelian theory is not accepted by all scientists. Dr. Sigmund Freud has been lauded by some and derided by others; some think he has given to science a key to the problem of psychosis; others reject his theory and have no faith in his interpretation of dreams. And Pharaoh dreamed! He had Joseph. Modern taggers of

Freud in the interpretation of dreams can hardly expect to score like Joseph. In accordance with the Mendelian theory supplemented by the Freudian theory it is proclaimed:

"The total inheritance of an individual is divisible into unit characters, each of which is, as a general rule, inherited independently of all other characters and may therefore be studied without reference to them.

"The inheritance of any such character is believed to be dependent upon the presence in the germ plasm of a unit of substance called a *determiner*.

"With reference to any given character the condition in an individual may be *dominant* or *recessive:* the character is dominant when, depending upon the presence of its determiner in the germ plasm, it is plainly manifest; and it is recessive when, owing to the lack of its determiner in the germ plasm, it is not present in the individual under consideration." Eugenics Record Office Bulletin No. 5.

An individual may stand free from fault in the eugenic sense but if his ancestral history brings into play the theory that he may have recessive determiner in his germ plasm he is branded unfit to procreate. That few may escape there has been coined the inclusive drag net terms, "duplex inheritance" (both parents), "simplex inheritance" (one parent), "nulliplex inheritance," which is a throw back beyond parents. One wonders if another plex, styled perplex, ought not to be added. The recessive condition not being apparent can only be known in a study of ancestry and offspring. If parents are unfortunate enough to have an idiot, an imbecile or feeble-minded child, they fall under suspicion of having the recessive germ plasm and ancestors are, as it were, pulled from the grave and gossip gathered in a search for the nulliplex inheritance. This will prove a fine field for public paid workers.

Biology, psychology, psychiatry, psychoanalysis and

medicine are not exact sciences. The human element prevents. The Binet test does not command the support of all scientific experts; it has its limitations along with the Freudian and Mendelian theories. Doctors disagree in diagnosis of diseases and, in the expert medical mental field, their differences are notorious. Witness the Thaw trial in New York and the Loeb trial in Chicago. The reason for this is that medicine is not an exact science and members of the profession may radically and honestly differ in opinion. The uncertainty of determination under the loose provisions of this act arising from the tests applied and the particular theories of an examiner, the inability to obtain the true history of the defective and his ancestors and the impossibility of accepting any theory as applicable to individual cases leads one to pause and contemplate the deplorable injustice of probable mistakes.

This is confessed in the following quotation from the late work (1923) on "Crime, Abnormal Minds and the Law," by Hoag and Williams, doctors, psychologists and psychiatrists, page 31:

"There has always been some uncertainty, however, in making a diagnostic distinction between native feeble-mindedness on the one hand and acquired defect resulting in retardation on the other. That uncertainty may always obtain. The distinction referred to is an all important one to make when we are considering sterilization as a practical measure. The theory is that only those who are feeble-minded by heredity can possibly transmit their defect to their progeny. Furthermore, it is urged that we as yet know so little of the laws of inheritance from feeble-minded or from any other stock that we are not yet justified in moving to adopt sterilization as a general method of procedure. We must always bear in mind, too, the possibility of an improvement in the stock by crossing. This seems to be indicated in the study of the Jukes family in 1915.

"Even if the foregoing objection to the adoption of

sterilization as a general method did not obtain there would still remain the obstacle that is presented in the state of public sentiment, which, on the whole, is inclined to look on the method as 'cruel and unusual'! To this is probably due the almost total disuse and early death of one sterilization law after another in the United States within recent years."

The line between congenital feeble-mindedness and arrested mental development is difficult of discovery, but inasmuch as this act is inclusive of feeble-mindedness by heredity and by causation not hereditary we need to understand not only what is included within the term feeble-mindedness but as well the causes and occasions thereof. All authority recognizes that subnormality may be due to developmental failure arising from accident, disease and many other causes. Transmission by the mentally defective in such cases does not come within the germ plasm determiner theory.

It is stated by Hoag and Williams, *supra*, p. 285:

"Too much emphasis cannot be placed on the proposition that each individual is an individual case, that a complete diagnosis can be made only by a thoroughly trained physician, bringing to his aid all the resources of psychiatry, psychology, sociology, common sense, and a practical knowledge of human nature in general and criminal human nature in particular. It must be added that the judgments of such an expert are not infallible, and there is so much still to be learned that it seems as if a beginning had hardly been made."

White, Outlines of Psychiatry (10th Ed. 1924), p. 314, states:

"The various grades of idiocy and imbecility may take their origin at any point in the development of the individual, during intrauterine life, at birth as a result of injury, after birth as a result of injury or disease which interferes with further development."

Feeble-mindedness in the abstract is inclusive of all grades, and the provisions of this act take all having such mental condition by inheritance and all others

capable of procreation and not able to support and care for their children, if such children would probably become public charges. This last provision exempts the rich and sterilizes the poor. This is class legislation. What constitutes one a mentally defective person? Feeble-mindedness. What is feeble-mindedness? This act declares the mentally defective persons within the meaning of the law shall include idiots, imbeciles and the feeble-minded, but not insane persons. If a feeble-minded person becomes insane, will he be saved from sterilization or will his previous condition mark him for the operation?

Now, who are feeble-minded? The following is quoted from White, Outline of Psychiatry (10th Ed. 1924), Subject Idiocy and Imbecility, p. 314:

"Feeble-mindedness.—A condition of slight mental defectiveness capable of much improvement by educational methods. The afflicted individual may ultimately take a place in the world and be self-supporting under favorable circumstances.

"Imbecility.—A condition of mental deficiency which can, however, be materially improved by training, but not sufficiently for the subject to take a place in the world.

* * * "Idiocy is a condition of profound mental defectiveness. The lower grades are unteachable, while the higher may be trained slightly in self help, *i. e.,* to attend to calls of nature. * * *

"Causes.—The causes of idiocy, like those of the psychoses, are numerous and varied. Hereditary defects are found in the ascendents in a large proportion of cases. Accidents and injuries, especially those associated with prolonged labor and instrumental delivery, are common causes, while diseases involving the brain, such as the acute infections—pneumonia, typhoid, the exanthemata—and syphilis often play a role. Alcoholism in one or both parents, especially drunkenness at the time of conception, may probably be a very important factor, while any infection, including syphilis, or debilitating conditions of the parents is important. Fright of the mother may be

a potent factor as indicated by the statistics of births during sieges."

What standard is to be looked to in determining feeble-mindedness? The feeble-minded lack something, it is true, but all do not lack to the same extent. What caused the trouble? Was it inherited by way of the germ plasm or caused by something else?

Lewis M. Terman, in his Diagnosis of Feeble-mindedness, given in the Addresses and Proceedings of the Fifty-Fourth Annual Meeting of the National Education Association of the United States, vol. 54, p. 881, mentions the fact that "the term feeble-mindedness is currently used in two very different senses."

"In one sense, it refers to the possession of no more than a certain degree of mental—chiefly intellectual—capacity as measured by some objective scale. This is the psychological definition.

"As more commonly employed, the term 'feeble-minded' has reference primarily to those who, because of inherent or early acquired mental weakness, cannot get on in the world, those who 'cannot compete on equal terms with their fellows,' or 'cannot manage themselves nor their affairs with ordinary prudence.' This is the social criterion, which received definite formulation by the Royal College of Physicians, London.

"These two criteria, the psychological and the social, cannot be used interchangeably, for the reason that ability to get on in the world depends upon many things besides absolute mental capacity, such as health, looks, bearing, muscular strength, inherited wealth, sympathetic friends, economic and industrial conditions, the prevailing level of intelligence in those with whom the subject must compete, etc. The social criterion is attractive and plausible only so long as it remains unanalyzed. It is far too shifting and indefinite to serve as a working concept in science."

This act admits of employment of both the psychological and the social diagnosis of feeble-mindedness.

Where is the border line between the feeble-minded to be sterilized and those to be left immune? This act is possible of great wrong. Mistakes under this law will be made, but if the law is upheld they will be *lawful* mistakes. It reminds one of the passage in the History of Diodorus Siculus (book 1, chap. 6) about the law of ancient Egypt, enacted at the behest of the doctors. There remedies for the sick were prescribed by law. If they were employed without cure there was no blame. But if other medicines were used the offender suffered death, "inasmuch as the law maker appointed such receipts for cure as were approved by the most learned doctors." * * * This was old time tyranny of the medical men who ran to the law to carry out their unchangeable wisdom.

What standard is to be adopted? No single standard is yet satisfactory or fully reliable. Certain standards accepted by some and scoffed at by others rest upon the Mendelian theory as amplified. This act in its operation rests upon the opinions of the physicians appointed by the court and until there is an universal standard accepted by the experts we may have one theory of heredity in one case and another possibly in the next unless the same physicians are kept on the job.

What elements are to be considered? Every method yet devised is uncertain, has supporters and detractors. A physician appointed may place excessive reliance on a single method, the theory of which appeals to him and the poor individual's virility be offered up at the speculative altar of a particular fad.

What credence shall be accorded to the mere intellectual aspect of the subject? The feeble-minded may look alike and yet one be the carrier of the defective germ plasm and another the victim of accident or disease. If history of the ancestry of the subject is essential, is it to rest upon disclosed traits alone of

the ancestors without knowledge whether so by reason of accident or disease?

How long is the subject to be observed by the expert? It is wretched to think that capacity for improvement is to be the subject of opinion without prolonged observation under experimental conditions. This act permits haste, superficiality, lack of broad scientific training, or knowledge of accepted psycho-sociological methods (if there are any such), omits correctional tests and permits an irremediable mutilation upon mere opinion.

In an introduction to Von Bar's History of Continental Criminal Law, Edwin Roulette Keedy, professor of law in the University of Pennsylvania, stated in 1916:

"What is even more striking, our legislatures enact statutes without considering the question of whether they can be enforced. A notable instance of this is found in the recent laws for the sterilization of defectives and criminals. A popular theory was seized upon by enthusiasts and made the basis for legislative proposals, which became law in many States. The theory is now to a large extent discredited and the laws are not being enforced."

It is said the operation is not very painful and of short duration and the surgeon commands scientific aids and considers the patient a human being and treats him with scientific kindness. This reminds one of old Izaak Walton's instruction in baiting a fish hook, to "treat the worm as you would a friend."

This law brings to play the theories of the positive eugenicist. What is to be his guide in making determination? How far is he to look to ancestry and be guided by hearsay or historical fragmentary data?

In an article on Biology Moulding the Future, by J. B. S. Haldane in The Forum, March, 1925, it is said:

"We know very little about human heredity as yet,

though nowhere are rasher statements made about it than in America; and many of the deeds done there in the name of eugenics are about as much justified by science as were the proceedings of the Inquisition by the Gospels."

Under this law the power to procreate is to be destroyed. How? By X-rays or the operation of vasectomy or salpingectomy or other treatment as may be least dangerous to life. This permits treatments not designated, so long as the treatment employed is least dangerous to life.

"Least dangerous to life" recognizes danger to life. What form of operation will be performed? Suppose some court is satisfied that the most effective sterilization is cutting off or out the essential organs of generation and that such is no more dangerous to life than vasectomy and salpingectomy, may it be performed? This act even reaches babes in the cradle.

What is vasectomy? It is said:

"Vasectomy is known to the medical profession as 'an office operation' painlessly performed in a few minutes, under an anæsthetic (cocaine) through a skin cut half an inch long, and entailing no wound infection, no confinement to bed. * * *

"Vasectomy consists of ligating and resecting a small portion of the *vas deferens*." Quoted in *State* v. *Feilen*, 70 Wash. 65 (126 Pac. 75, 41 L. R. A. [N. S.] 418, Ann. Cas. 1914B, 512).

The operation of vasectomy is also said to be a simple one, taking but three or four minutes and no anæsthetic is ordinarily employed. The same may be said of castration of a hog. It is also said that desire for sexual congress, and all concomitants of normal coition remain practically unchanged. This consolation may appeal to idiots. Salpingectomy is castration of the female, pure and simple, involves two quite major operations, endangers life and entails a profound shock to the nervous system. If performed during the

period of adolescence the operation results in consequences nature visits upon man-made neuters. Any one interested need but delve into the history of eunuchs to learn the physical and mental consequences nature visits upon the victim of abrupt ablation of virility.

Ultimately it is hoped, by ardent supporters of sterilization, to extend examination to the whole population, and by the less ardent this is only expected in case it is found necessary to do so to meet the equal protection of the law in the Federal Constitution.

Resecting of the *vas deferens* is in its effect emasculation. The ablation of the sexual organs causes a considerable change in subsequent bodily development if performed in infancy. It tends to neurosis and degeneration at any age. Adult women become fat and often suffer from nervous troubles and change in character. Eunuchs, it is said

"have a weak, slow pulse, are prone to hemorrhoids, liver troubles, indicating concomitant decline of glandular vigor, rarely live to old age, and resemble animals thus operated upon which are more tractable and more easily domesticated." 1 Hall, The Psychology of Adolescence, p. 428.

How far society may undertake to enforce human stirpiculture by methods of sterilization involves rights of persons under constitutional forms of government. It is claimed there is a distinction between sterilization and castration. It is a distinction without a difference.

"A eunuch is a male whose organs of generation have been so far removed or disorganized that he is left entirely incapable of reproducing his species." Domat Civ. Law 54 prel. tit. 2, sec. 1, Note 10.

See, also, Schumaker and Longsdorf, Cyclopedic Law Dictionary, subject Eunuch.

Without conceding the desirability of improving the

human race by mutilation of the generative organs of idiots, imbeciles and the feeble-minded, is there power to so legislate without violation of constitutional guarantees relative to the bodily integrity of persons? This statute is far-reaching; it goes beyond the probable apprehension of the members of the legislative body enacting it. If one breeds a fool, is the idea to sterilize the fool and also the breeders for fear they may repeat? If the feeble-minded breeds a normal then is the idea to sterilize him because under the theory of heredity such progeny may throw back? If the purpose is to prevent operation of the defective germ plasm, that plasm must be looked for in all carriers thereof. Short or long reasoning on the subject leads to rejection of the whole scheme.

The scope of intended employment of the police power in sterilization has been stated by advocates thereof, as follows:

> "That the segregation program to be supported by a sterilization program as follows: 'That during the period while under State custody every inmate (except those committed for life) of an institution maintained in whole or in part by the public funds be examined as to innate personal traits and family pedigree, and that all such inmates found to be potential parents with undesirable hereditary potentialities and not likely to be governed by the highest moral purpose shall be humanely sterilized prior to release from their respective custodians.
>
> "Such a supplementary sterilization program will call for surgical sterilization of inmates prior to their release from institutions as follows: beginning with approximately 80 persons per year per 100,000 total population in 1915 and increasing to approximately 150 persons per year per 100,000 total population in 1980."

This would call for about 4,000 operations in the present year of grace in Michigan. It would reach the blind, deaf and dumb, insane, tubercular by

heredity (if there is any such thing), syphilitic by heredity and acquirement, and the medical disciple would revel in a very saturnalia of asexualization.

The order in the probate court was based on the certificates of three physicians who formed their "opinion" upon the following grounds:

"(*a*) I certify that children procreated by said mentally defective person will have an inherited tendency to mental defectiveness and that there is no probability that his condition will improve so that said children will not have such inherited tendency.

"(*b*) I certify that said mentally defective person would not be able to support and care for his children, if any, and such children would probably become public charges by reason of his own mental defectiveness."

This fails to show the occasion of the feeble-mindedness, whether inherited or acquired. The certificate that Willie Smith will "not be able to support and care for his children, if any, and such children would probably become public charges by reason of his mental defectiveness" brings this case squarely within the inhibition of class legislation. If this law is held valid then the measure of power of asexualization has not yet been marked and classes may be added and tyranny expanded. This law violates the Constitution and inherent rights, transcends legislative power, imposes cruel and unusual mutilations upon some citizens, while constituting the like treatment of all others a crime, thereby depriving some of the equal protection of the law, and is void.

The adjudication in the probate court should be set aside and held for naught and the writ should issue to such effect.

BIRD and FELLOWS, JJ., concurred with WIEST, J.