ALICE SMITH, PROSECUTRIX, v. BOARD OF EXAMINERS OF FEEBLE-MINDED (INCLUDING IDIOTS, IMBECILES AND MORONS), EPILEPTICS, CRIMINALS AND OTHER DEFECTIVES.

Submitted July 3, 1913—Decided November 18, 1913.

1. The artificial regulation of the welfare of society by means of surgical operations for the prevention of procreation being based upon the suppression of the personal liberty of individuals must be accomplished, if at all, by a statute that does not deny to the persons thus injuriously affected the equal protection of the laws guaranteed by the fourteenth amendment to the constitution of the United States.

2. The board of examiners created by "An act to authorize and provide for the sterilization of feeble-minded (including idiots, imbeciles and morons), epileptics, rapists, certain criminals and other defectives" (*Pamph. L.* 1911, *p.* 353) ordered that the operation of salpingectomy be performed upon one Alice Smith, an epileptic inmate of a state charitable institution, as the most effective operation for the prevention of procreation. *Held*, that the statute in question was based upon a classification that bore no reasonable relation to the object of such police regulation and hence denied to the individuals of the class so selected the equal protection of the laws guaranteed by the fourteenth amendment to the constitution of the United States.

On *certiorari.*

The order brought up by this writ of *certiorari* is as follows:

"The Board of Examiners of Feeble-Minded (including idiots, imbeciles and morons), Epileptics, Criminals and other Defectives, together with David F. Weeks, the chief physician of the New Jersey state village for epileptics, having on the 31st day of May, 1912, regularly convened at the administration building at the New Jersey state village for epileptics (according to the provisions of chapter 190, page 353, of the laws of 1911, statutes of the State of New Jersey), and at that time, in the presence of Azariah M. Beckman, counsel regularly appointed to represent Alice Smith, an inmate of said village, committed thereto on August 19th, 1902, by Alfred F. Skinner, judge of the Court of Common Pleas of Essex county, application for the appointment of said counsel having been made to and the appointment having been made, previous to the holding of said hearing, by the judge of the Court of Common Pleas of the county of Somerset, in which county the institution in which the said Alice Smith is an inmate is located, having examined into the mental and physical condition of the said Alice Smith, do find and declare her to be an epileptic person within the meaning of the said act; and the said board, together with the chief physician of said institution, having unanimously found in the case of said Alice Smith, that procreation by her is inadvisable, and that there is no probability that the condition

of said Alice Smith, so examined, will improve to such an extent as to render procreation by said Alice Smith advisable :"

"It is, therefore, on this the thirty-first day of May, nineteen hundred and twelve, ordered, that the operation of salpingectomy, as the most effective operation for the prevention of procreation, be performed upon the said Alice Smith in accordance with the motion at said hearing unanimously adopted."

The pertinent parts of the statute under which this order was made are as follows:

"An act to authorize and provide for the sterilization of feeble-minded (including idiots, imbeciles and morons), epileptics, rapists, certain criminals and other defectives. *Pamph. L.* 1911, *p.* 353.

"WHEREAS, Heredity plays a most important part in the transmission of feeble-mindedness, epilepsy, criminal tendencies and other defects:

"BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

"1. Immediately after the passage of this act, the governor shall appoint by and with the advice of the senate, a surgeon and a neurologist, each of recognized ability, one for a term of three (3) years and one for a term of five (5) years, their successors each to be appointed for the full term of five years, who in conjunction with the commissioner of charities and corrections shall be known as and is hereby created the 'board of examiners of feeble-minded (including idiots, imbeciles and morons), epileptics, criminals and other defectives,' whose duty it shall be to examine into the mental and physical condition of the feeble-minded, epileptic, certain criminal and other defective inmates confined in the several reformatories, charitable and penal institutions in the counties and state.

"2. The criminals who shall come within the operation of this law shall be those who have been convicted of the crime of rape, or of such succession of offences against the criminal law as in the opinion of this board of examiners shall be

deemed to be sufficient evidence of confirmed criminal tendencies.

"3. Upon application of the superintendent or other administrative officer of any institution in which such inmates are or may be confined, or upon its own motions, the said board of examiners may call a meeting to take evidence and examine into the mental and physical condition of such inmates confined as aforesaid, and if said board of examiners, in conjunction with the chief physician of the institution, unanimously find that procreation is inadvisable, and that there is no probability that the condition of such inmate° so examined shall improve to such an extent as to render procreation by such inmate advisable, it shall be lawful to perform such operation for the prevention of procreation as shall be decided by said board of examiners to be most effective, and thereupon it shall and may be lawful for any surgeon qualified under the laws of this state, under the direction of the chief physician of said institution, to perform such operation."

Before Justices GARRISON, TRENCHARD and MINTURN.

For the prosecutrix, *Azariah M. Beekman.*

For the defendant, *Nelson B. Gaskill,* assistant attorney-general (*Elmore T. Elver,* of the Wisconsin bar, on the brief).

The opinion of the court was delivered by

GARRISON, J. The question propounded is whether or not the statute under which the order now before us was made is a valid exercise of the police power. The statute, it will be observed, applies also to criminals in which aspect it does not now concern us since the prosecutrix is an epileptic, an unfortunate person but not a criminal.

The order is made by the board of examiners provided by the act of April 21st, 1911. *Pamph. L., p.* 353. Briefly stated, the order after reciting that Alice Smith is an

epileptic inmate of a state charitable institution, that pro-
creation by her is inadvisable, and that there is no probability
that her condition will improve to such an extent as to render
procreation by her advisable, orders that the operation of
salpingectomy be performed upon the said Alice Smith.

Salpingectomy is the incision or excision of the fallopian
tube, *i. e.*, either cutting it off or cutting it out. The fallo-
pian tube is an essential part of the female reproductive
system and consists of a narrow conduit some four inches in
length that extends on each side of a woman's body from the
base of the womb to the ovary upon that side. These three
organs, *i. e.*, the ovary, the fallopian tube and the uterus,
are all concerned in normal child-bearing, the relation be-
tween them being that the unfecundated ovum which is
periodically produced in the ovary passes down through the
fallopian tube into the body of the uterus, where if fecunda-
tion by the male seed takes place, or has taken place, the
embryo is formed and developed into the fœtus or unborn
child.

The statute is broad enough to authorize an operation for
the removal of any one of these three organs essential to
procreation. These organs are in pairs on either side of the
body, excepting the uterus which is a single organ lying deep
in the pelvis back of the bladder. The operation of salp-
ingectomy therefore to be effective must be performed on
both sides of the body, and hence, is in effect two operations,
both requiring deep-seated surgery under profound and pro-
longed anæsthesia, and hence, involving all of the dangers to
life incident thereto, whether arising from the anæsthetic,
from surgical shock or from the inflammation or infection
incident to surgical interference with the peritoneal cavity.
These ordinary incidents and dangers of such an operation
are not lessened where the operation is not sought by the
patient, but must be performed upon her by force at least to
the extent of the production of such anæsthesia as shall com-
pletely destroy all liberty of will or action. The order is
addressed to no one and is silent as to the person by whom
this operation is to be performed, and the statute likewise is

silent upon this subject excepting that when an order is made, "thereupon it shall be and may be lawful for any surgeon qualified under the laws of this state, under the direction of the chief physician of said institution, to perform such operation."

The prosecutrix falls within the classification of the statute, in that she is an inmate of the state village for epileptics, a state charitable institution, "the objects of which," as stated in the act creating it, are "to secure the humane, curative, scientific and economical care and treatment of epilepsy." *4 Comp. Stat., p.* 4961.

The prosecutrix has been an inmate of this charity since 1902, and for the five years last past she has had no attack of the disease. From this statement of the facts it is clear that the order with which we have to deal threatens possibly the life and certainly the liberty of the prosecutrix in a manner forbidden by both the state and federal constitutions, unless such order is a valid exercise of the police power. The question thus presented is, therefore, not one of those constitutional questions that are primarily addressed to the legislature, but a purely legal question as to the due exercise of the police power which is always a matter for determination by the courts.

This power, stated as broadly as the argument in support of the order requires, is the exercise by the legislature of a state of its inherent sovereignty to enact and enforce whatever regulations are in its judgment demanded for the welfare of society at large in order to secure or to guard its order, safety, health or morals. The general limitation of such power to which the prosecutrix must appeal is that under our system of government the artificial enhancement of the public welfare by the forceable suppression of the constitutional rights of the individual is inadmissible.

Somewhere between these two fundamental propositions the exercise of the police power in the present case must fall and its assignment to the former rather than to the latter involves consequences of the gravest magnitude. For while the case in hand raises the very important and novel question

whether it is one of the attributes of government to essay the theoretical improvement of society by destroying the function of procreation in certain of its members who are not male-factors against its laws, it is evident that the decision of that question carries with it certain logical consequences having far-reaching results.   For the feeble-minded and epileptics are not the only persons in the community whose elimination as undesirable citizens would, or might in the judgment of the legislature, be a distinct benefit to society.   If the enforced sterility of this class be a legitimate exercise of governmental power, a wide field of legislative activity and duty is thrown open to which it would be difficult to assign a legal limit.

If in the present case we decide that such a power exists in the case of epileptics, the doctrine we shall have enunciated cannot stop there.   For epilepsy is not the only disease by which the welfare of society at large is injuriously affected, indeed, not being communicable by contagion or otherwise, it lacks some of the gravest dangers that attend upon such diseases as pulmonary consumption or communicable syphilis. So that it would seem to be a logical necessity that, if the legislature may under the police power theoretically benefit the next generation by the sterilization of the epileptics of this, it both may and should pursue the like course with respect to the other diseases mentioned with the additional gain to society thereby arising from the protection of the present generation from contagion or contamination.   Even when these and many other diseases that might be named have been included, the limits of logical necessity have by no means been reached.

There are other things besides physical or mental diseases that may render persons undesirable citizens or might do so in the opinion of a majority of a prevailing legislature. Racial differences, for instance, might afford a basis for such an opinion in communities where that question is unfortunately a permanent and paramount issue.   Even beyond all such considerations it might be logically consistent to bring the philosophic theory of Malthus to bear upon the

police power, to the end that the tendency of population to outgrow its means of subsistence should be counteracted by surgical interference of the sort we are now considering.

Evidently the large and underlying question is how far is government constitutionally justified in the theoretical betterment of society by means of the surgical sterilization of certain of its unoffending but undesirable members. If some, but by no means all, of these illustrations are fanciful, they still serve their purpose of indicating why we place the decision of the present case upon a ground that has no such logical results or untoward consequences.

Such a ground is presented by the classification upon which the present statute is based, which is of such a nature that the persons included within it are not afforded the equal protection of the laws under the fourteenth amendment of the constitution of the United States, which provides that "no state shall deny to any person within its jurisdiction the equal protection of the laws." Under this provision it has been uniformly held that a state statute that bears solely upon a class of persons selected by it must not only bear alike upon all the individuals of such class, but that the class as a whole must bear some reasonable relation to the legislation thus solely affecting the individuals that compose it.

"It is apparent," said Mr. Justice Brewer, in *Gulf, Colorado, &c., Railroad Co.* v. *Ellis,* 165 *U. S.* 150, after a review of many cases, "that the mere fact of classification is not sufficient to relieve a statute from the reach of the equality clause of the fourteenth amendment, and that in all cases it must appear, not only that a classification has been made, but also that it is one based upon some reasonable ground—some difference which bears a just and proper relation to the attempted classification—and is not a mere arbitrary selection."

This summarizes a mass of cases that might be cited.

Turning our attention now to the classification on which the present statute is based and laying aside criminals and persons confined in penal institutions with which we have no present concern, it will be seen that—as to epileptics, with which alone we have to do—the force of the statute falls

wholly upon such epileptics as are "inmates confined in the several charitable institutions in the counties and state." It must be apparent that the class thus selected is singularly narrow, when the broad purpose of the statute and the avowed object sought to be accomplished by it are considered. The objection, however, is not that the class is small as compared with the magnitude of the purpose in view, which is nothing less than the artificial improvement of society at large, but that it is singularly inept for the accomplishment of that purpose in this respect, viz., that if such object requires the sterilization of the class so selected, then *a fortiori* does it require the sterilization of the vastly greater class who are not protected from procreation by their confinement in state or county institutions.

The broad class to which the legislative remedy is normally applicable is that of epileptics, *i. e.,* all epileptics. Now, epilepsy, if not, as some authorities contend, mainly a disease of the well to do and overfed, is at least one that affects all ranks of society, the rich as well as the poor. If it be conceded for the sake of argument that the legislature may select one of these broadly defined classes, *i. e.,* the poor, and may legislate solely with reference to this class, it is evident that by the further subclassification of the poor into those who are and those who are not inmates in public charitable institutions, a principle of selection is adopted that bears no reasonable relation to the proposed scheme for the artificial betterment of society. For not only will society at large be just as injuriously affected by the procreation of epileptics who are not confined in such institutions as it will be by the procreation of those who are so confined, but the former vastly outnumber the latter and are in the nature of things vastly more exposed to the temptation and opportunity of procreation, which indeed in the cases of those confined in a presumably well conducted public institution is reduced practically to *nil.*

The particular vice, therefore, of the present classification is not so much that it creates a subclassification based upon no reasonable basis, as that having thereby arbitrarily created

two classes, it applies the statutory remedy to that one of those classes to which it has the least, and in no event a sole, application, and to which indeed upon the presumption of the proper management of our public institutions it has no application at all. When we consider that such statutory scheme necessarily involves a suppression of personal liberty, and a possible menace to the life of the individual who must submit to it, it is not asking too much that an artificial regulation of society that involves these constitutional rights of some of its members shall be accomplished, if at all, by a statute that does not deny to the persons injuriously affected the equal protection of the laws guaranteed by the federal constitution.

The suggestion that the classification might be sufficient if the scheme of the statute were to turn the sterilized inmates of such public institutes loose upon the community and thereby to effect a saving of expense to the public, is not deserving of serious consideration. The palpable inhumanity and immorality of such a scheme forbids us to impute it to an enlightened legislature that evidently enacted the present statute for a worthy social end upon the merits of which our present decision upon strictly legal lines is in no sense to be regarded as a reflection.

The conclusion we have reached is that without regard to the power of the state to subject its citizens to surgical operations that shall render procreation by them impossible, the present statute is invalid in that it denies to the prosecutrix of this writ the equal protection of the laws to which, under the constitution of the United States, she is entitled.

The order brought up by this writ is set aside.