170 N.J. Super. 98 (1979)
405 A.2d 851
IN THE MATTER OF LEE ANN GRADY.
Superior Court of New Jersey, Chancery Division.
July 12, 1979.
*100 Mr. William T. Cooper for Edward F. and Luanne E. Grady (Mr. Richard A. Somerville on the brief).
Mr. Richard Kahn, guardian ad litem, for Lee Ann Grady (Mr. John T. Byrnes, Jr., on the brief).
Mr. Stanley C. Van Ness, Public Advocate (Ms. Nancy J. Geltman appearing and on the brief).
Mr. John J. Degnan, Attorney General (Mr. Steven D. Wallach and Ms. Andrea M. Silkowitz, appearing, Mr. Michael R. Cole, of counsel).
*101 Mr. Clifford W. Starrett for Morristown Memorial Hospital (Messrs. Schenck, Price, Smith & King, attorneys).
POLOW, J.S.C.
Lee Ann Grady is an 18-year-old alleged incompetent afflicted with Down's Syndrome. Her parents sought to have her sterilized by tubal ligation but their request was rejected by Morristown Memorial Hospital unless authorized by the court.
Seeking such authority, Lee Ann's parents filed the present complaint. They allege that their daughter has neither knowledge of nor ability to understand sexual relations or reproduction; that she is unable to decide to have and would be unable to care for a child. Supported by affidavits of two physicians, the complaint seeks appointment of a special guardian authorized to consent to the proposed tubal ligation.
On the return date of the original order to show cause this court declined to rule on the basis of the physicians' affidavits alone. Instead, a plenary hearing was ordered at which medical and psychiatric testimony would be presented concerning Lee Ann's competency and her physical and mental capabilities and disabilities, particularly as they relate to her capacity to bear and raise children.
Also on the return date, a guardian ad litem in the person of Richard Kahn, Esquire, was appointed to represent Lee Ann during these proceedings. The parents, however, seek to be appointed as general guardians upon a declaration of incompetency.
The guardian ad litem was directed to give notice of these proceedings to the Public Advocate and the Attorney General, both of whom ultimately intervened.
Upon application by the guardian ad litem an order was entered requiring that all testimony concerning Lee Ann's personal physical and mental characteristics be taken in private and impounded. After in camera testimony by Lee Ann's father and *102 two medical experts, counsel composed the following stipulation of facts for the record:
1. Lee Ann Grady is an 18-year-old Down's Syndrome female.
2. Lee Ann is the oldest of three children of Edward F. and Luanne Grady. Lee Ann lives at home with her parents and never has been institutionalized.
3. Lee Ann's parents are responsible, loving and affectionate people. Lee Ann enjoys a loving, caring relationship with her family.
4. Lee Ann suffers from Down's Syndrome, Trisomy 21 Karyotype.
5. Lee Ann is presently functioning at the upper range of severe mental retardation. Her intelligence quotient is in the upper 20s to upper 30s range. Social maturation and developmental scales are within the same range.
6. Lee Ann has some difficulty in communicating with other people.
7. Lee Ann is functioning educationally as a trainable student.
8. Due to the genetic basis of her disabilities, medical or other treatment will not significantly alleviate her mental developmental or social disabilities. It is unlikely that there will be any significant improvement in her mental, social and developmental capabilities at any time in the future.
9. Lee Ann suffers from no extraordinary medical health problems. In particular, she does not appear to have any of the serious physical illnesses often associated with Down's Syndrome. She is expected to have a life expectancy of normal duration.
10. Lee Ann is incapable now and in all likelihood will remain incapable for her lifetime of caring for herself and her personal needs as an independent adult. Through the remainder of her lifetime Lee Ann will in all likelihood remain dependent upon others for her personal care.
11. Lee Ann is incapable now and in all likelihood will remain incapable for her lifetime of being responsible for the care of any other person, including an offspring.
12. Lee Ann's ability to think, reason, form judgments and make reasoned decisions is very limited.
13. She is incapable now and in all likelihood will continue to be incapable in the future of making reasoned decisions concerning matters of procreation and contraception.
14. Lee Ann is unfit and unable to govern herself and to manage her affairs.
Thereafter, several days of expert testimony was taken in open court.[1]

*103 The Nature of Down's Syndrome

Down's Syndrome results from chromosomal error. In the most common form of the disorder the cells of patients with Down's Syndrome contain 47 chromosomes rather than the normal 46, there being three # 21 chromosomes instead of the usual pair. Varying degrees of mental retardation, often serious developmental difficulties, and any of a large number of physical anomalies characterize the disorder. The largest identifiable group of the mentally retarded is composed of Down's Syndrome individuals.
Down's Syndrome bears the name of London physician John Landgon Haydon Down (1826-1896), who was the first to differentiate it from other types of mental retardation. In his classic lecture presented in 1866 he compared the facial and physical features of Down's individuals to those of Mongols. Thus Down's Syndrome came to be known as Mongolism and those afflicted as Mongoloids. Counsel have agreed that the use of such misleading and degrading ethnic labels serves no purpose and should be avoided.
In the last 20 years we have witnessed a revolution in our understanding of Down's Syndrome. While the causes remain unclear, the mystery of the chromosomal aberration has been solved. Our knowledge of the varying effects on afflicted individuals is greatly improved and continues to expand. Medical advances have provided the ability to surgically correct congenital heart defects, cleft palate and intestinal disorders. Antibiotic therapy has controlled respiratory and middle ear infections. Increased understanding of proper nutritional management can prevent obesity. Life expectancy has been increased from an average of 9 years (1929) to 18 years (1948) to a possible 50, 60 or 70 years today.[2]
*104 Recent years have also brought an awareness that patients with Down's Syndrome are not a homogeneous group. There are wide variations among Down's individuals in physical features, intellectual and developmental capabilities, psychological makeup and personality traits.[3]
Attitudes toward habilitation are decidedly more humanitarian and the prognosis for the fullest possible development of the Down's Syndrome individual is enormously brighter. Experts counsel parents against attempting to create a virtually risk-free environment. A degree of risk-taking and failure is an undeniable part of the process of gaining the fullest possible independence and maturity. Instead, structured situations in which the adolescent can accept responsibility, make decisions and initiate actions are desirable. Automatic placement in an institution is giving way to home care in a family setting. Home care supplemented by an aggressive early intervention program has made a significant difference in the levels of achievement of Down's children.
The trend away from institutional care has led to creation of public school classes for educable and trainable mentally retarded children. Sheltered workshops and neighborhood board-and-care facilities can provide lifetime care. Community groups have become aware of the need to provide recreational and social opportunities for the mentally handicapped. With these improvements, experiences once thought to be exclusively available to the "normal" population can also be enjoyed by the retarded.
The parents of Lee Ann Grady have given her the advantages of home care and public school classes for trainable children from which Lee Ann has unquestionably benefitted. They propose to afford her the additional advantages that a group-living program with sheltered workshops and recreational and *105 social activities would offer. They perceive the relief sought here as a desirable step toward more independent living.
That which Justice Pashman said of Sharon Berman applies as well to Lee Ann Grady.
Notwithstanding her affliction with Down's Syndrome Sharon, by virtue of her birth, will be able to love and be loved and to experience happiness and pleasure  emotions which are truly the essence of life and which are far more valuable than the suffering she may endure. [Berman v. Allan 80 N.J. 421 at 430 (1979)].

Down's Syndrome and Mental Retardation
Mental retardation is by far the most pervasive and limiting aspect of Down's Syndrome. The American Association on Mental Deficiency definition of mental retardation has the widest acceptance:
* * * Mental retardation refers to sub-average general intellectual functioning which originated during the developmental period and is associated with impairment in adaptive behavior.[4]
Mental retardation is commonly classified from profound to mild, according to IQ scores. The most profoundly retarded attain IQ scores under 20. They require virtually constant care and have major physical and sensory impairment. Those with scores of 20-35 are severely retarded. They manifest retarded speech, language and motor development. Persons in the moderate range (IQ scores 36-51) are usually slow or retarded in general development and require supervision in a sheltered environment. The mildly (IQ scores 52-67) and borderline (IQ scores 68-83) retarded frequently can work at suitable jobs and achieve a considerable degree of independence. Generally, those with IQ scores 50-75 have been classified as educable and those with 30-50 IQ as trainable.
*106 These categories are general; the number levels are arbitrary. It cannot be said too often: an IQ score is merely a guide.
Multiple handicaps such as speech and language deficits and hearing loss make IQ extremely difficult to assess. A phenomenon peculiar to Down's Syndrome is the discrepancy between auditory and visual recognition skills. The ability to learn, discriminate and remember by auditory means is poor, but visual acuity is comparatively good. The disparity exists irrespective of ability. Furthermore, talents, such as artistic and musical abilities, are not reflected in an IQ score.
For many years, it was assumed that the great majority of Down's patients were severely or profoundly retarded. But Siegfried Pueschel in his book Down's Syndrome: Growing and Learning, states:
As in many areas of development, the intellectual abilities of the child with Down's Syndrome have always been underestimated in the past. Recent reports, as well as our own investigations, negate previous impressions that children with Down's Syndrome are usually severely or profoundly retarded * * * the majority of children with Down's Syndrome function in the mild to moderate range of mental retardation.
Lee Ann functions in the upper range of severe retardation. Her IQ is in the upper 20s to upper 30s range. She has been attending classes for the trainable mentally retarded and in the past year has benefitted from sheltered workshop training. She will need lifelong supervision but her parents hope that her future may be planned to offer the maximum opportunity for personal independence and social interaction within the bounds of her natural limitations.

Down's Syndrome and Sexual Development
Parents strive to provide for their children the fullest possible emotional, social and sexual maturity by the end of adolescence. For the normal child this means total independence from home *107 and family. For the retarded youngster complete independence may not be a realistic aim.
The achievement of sexual maturity by the mentally retarded is a subject capable of evoking strong emotional responses. Society's reaction to the sexual behavior of the retarded traditionally has been shaped by misconceptions and dual standards. In The Special Child, Robin White states:
* * * our taboos about sex are often more strictly enforced upon [the developmentally disabled]. * * * An appalling amount of misinformation clouds our understanding and management of the sexuality of the brain-handicapped adolescent, who is nonetheless supposed to display behavior and attain psychosexual development difficult enough for the non-disabled.[5]
Among such misconceptions is the notion shared by many that sex drive of mentally retarded persons is deficient while many others believe it to be intensified. The fact is that the majority of the retarded population has the same basic need for love and sexual expression as the nonhandicapped.[6] This need varies in intensity just as in the normal population,[7] except for the profoundly retarded who exhibit little or no desire for sexual gratification.[8]
The current professional trend is toward encouraging interaction among mentally handicapped persons of opposite sexes for the achievement of greater maturity and living experience. Sexual experiences and encounters are not to be prohibited. The applicants envision the relief sought here as a factor toward *108 attainment of such a goal without the need for constant intensive supervision.[9]

Legal Trends in the History of Sterilization
Compulsory sterilization was an outgrowth of the eugenics movement which reflected the Social Darwinism of the late 19th Century.[10] It reached its peak in the United States during the 1920s. The eugenicists believed that physical, mental and even moral deficiencies were genetically based. A number of compulsory sterilization statutes were enacted consistent with that belief.
Mr. Justice Holmes, in a strong but now controversial statement, upheld a Virginia statute authorizing involuntary sterilization of mental defectives.
* * * We have seen more than once that the public welfare may call upon the best citizens for their lives. It would be strange if it could not call upon those who already sap the strength of the State for those lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence. It is better for all the world, if instead of waiting to execute *109 degenerate off(-)spring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. [Citation omitted]. Three generations of imbeciles are enough. [Buck v. Bell, 274 U.S. 200, 208, 47 S.Ct. 584, 585, 71 L.Ed. 1000 (1927)]
While the Supreme Court has never overruled Buck v. Bell for substantive reasons, compulsory sterilization statutes have been declared invalid on equal protection grounds. Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).
A New Jersey appellate court struck down a statute which allowed the sterilization of certain institutionalized groups of persons, including epileptics, because it offended equal protection. Smith v. Board of Examiners, 85 N.J.L. 46 (Sup.Ct. 1913). That statute provided that if the board of examiners in conjunction with the chief physician of any institution for the mentally retarded, epileptics, rapists, or criminals demonstrating "confirmed criminal tendencies" unanimously found that for a particular inmate procreation was inadvisable, and that there was no probability that the condition of the inmate would improve, a sterilization operation could be performed.
The historical justification for most compulsory sterilization statutes, that "[h]eredity plays a most important part in the transmission of feeble-mindedness, epilepsy, criminal tendencies and other defects," (L. 1911, p. 353), Smith, supra at 48, is no longer popularly acceptable nor scientifically valid.[11] Although compulsory sterilization statutes still exist, such statutes are subject to the strict "compelling governmental interest" test. See North Carolina Ass'n for Retarded Children v. North Carolina, 420 F. Supp. 451, 458 (M.D.N.C. 1976).
*110 Today most statutes addressing sterilization seek to protect residents and out-patients of certain types of institutions from arbitrary, capricious or abusive employment of such medical procedures.

Sterilization and the Right to Privacy
The right of individual choice is constitutionally protected and thus entitled to be exercised free of governmental intervention absent a compelling state interest. This right of privacy has been recognized primarily in cases involving intimate familial matters. See Karst, "Foreword: Equal Citizenship Under the Fourteenth Amendment," 91 Harv.L.Rev. 1, 31-32 (1977).
For example, Connecticut's birth control law, which prohibited the use of contraceptives by any person, was struck down as it applied to married couples in Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The court found within the "penumbras" of the specific guarantees of the Bill of Rights a right of privacy which insulates such individual decisions from governmental intrusion.
Griswold was thereafter expanded to invalidate a birth control law which prohibited single persons from obtaining contraceptives:
* * * If the right of privacy means anything, it is the right of the individual married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. [Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972)]
The right of personal privacy extends to the abortion decision, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and equally to minors and adults. In Planned Parenthood of Missouri v. Danforth, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d *111 788 (1976), the court held that parents could not veto the abortion decision of their minor daughter:
* * * Just as with the requirement of consent from the spouse, so here, the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and the patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent. [at 74, 96 S.Ct. at 2843]
And in Carey v. Population Services International, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), the court held unconstitutional a New York statute which prohibited the distribution of contraceptives to children under the age of 16.
A voluntary sterilization decision also is encompassed within the right of personal privacy. In Ponter v. Ponter, 135 N.J. Super. 50 (Ch.Div. 1975), the court held that a married woman had a constitutional right to be sterilized without spousal consent. Emphasizing the importance of the woman's right to choose whether or not to bear children, the court said:
Notwithstanding the fact Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), characterized procreation as a basic civil right, the courts have still considered a woman's right not to procreate paramount. [at 54].
The First Circuit, including voluntary sterilization within the reach of constitutional protection, has held that a state hospital may be compelled to perform sterilization procedures on a voluntary competent applicant. Hathaway v. Worcester City Hospital, 475 F.2d 701 (1 Cir.1973); Comment, 54 B.U.L.Rev. 845 (1974).
Given such constitutional underpinnings the State cannot prevent a free choice for voluntary sterilization. The New Jersey Supreme Court has ruled that the so-called "Conscience" law, N.J.S.A. 2A:65A-1 et seq., which directs that no hospital or health care facility shall be required to provide abortion or sterilization procedures, may not be interpreted to sanction a *112 nonsectarian, nonprofit hospital refusing the use of its facilities for elective abortions since such an interpretation would frustrate the constitutional right to free choice for an abortion during the first trimester.[12]Doe v. Bridgeton Hospital Ass'n, Inc., 71 N.J. 478 (1976), cert. den. 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977), denial of reopening and reconsideration aff'd 168 N.J. Super. 593 (App.Div. 1979).
Access to voluntary sterilization is as essential an ingredient of the constitutional right of privacy as the right to free choice for abortion or the right to procreate. One has as much right to protection from involuntary pregnancy as from involuntary sterilization.

Applicability of New Jersey's Statutes Protecting Rights of Mentally Retarded and Developmentally Disabled
Two New Jersey statutes are potentially applicable: N.J.S.A. 30:4-24.2(d)(2), a section of what is commonly known as the bill of rights for the mentally retarded, and N.J.S.A. 30:6D 5(a)(4) of the Developmentally Disabled Rights Act.
N.J.S.A. 30:4-24.2(d) provides that
d. Each patient in treatment shall have the following rights, a list of which shall be prominently posted in all facilities providing such services and otherwise brought to his attention by such additional means as the department may designate:
* * * * * * * *
(2) Not to be subjected to experimental research, shock treatment, psychosurgery or sterilization, without the express and informed consent of the patient after consultation with counsel or interested party of the patient's choice. Such consent shall be made in writing, a copy of which shall be placed in the patient's *113 treatment record. If the patient has been adjudicated incompetent a court of competent jurisdiction shall hold a hearing to determine the necessity of such procedure at which the client is physically present, represented by counsel, and provided the right and opportunity to be confronted with and to cross-examine all witnesses alleging the necessity of such proceedings. In such proceedings, the burden of proof shall be on the party alleging the necessity of such procedures. In the event that a patient cannot afford counsel, the court shall appoint an attorney not less than 10 days before the hearing. An attorney so appointed shall be entitled to a reasonable fee to be determined by the court and paid by the county from which the patient was admitted. Under no circumstances may a patient in treatment be subjected to experimental research which is not directly related to the specific goals of his treatment program.
Although this statute was obviously intended to curtail or prevent arbitrary and unnecessary medical procedures, it also may be fairly interpreted as authorizing sterilization if the statutory requirements are satisfied.
The guardian ad litem, however, argues that the statute does not apply here. The statute provides that each patient shall be afforded the rights therein enumerated. "Patient" is defined in the act as
* * * any person or persons alleged to be mentally ill, tuberculous, or mentally retarded whose admission to any institution for the care and treatment of such class of persons in this State has been applied for. [N.J.S.A. 30:4-23]
Consequently, he insists, the act reaches only those who have been or are to be admitted to an institution specifically for the care of such disorders. This is confirmed by N.J.S.A. 30-4-24, which provides that
The provisions of this Title shall govern the admission and commitment of the mentally ill, tuberculous, and mentally retarded to the several institutions designated therefor and govern and control all phases of the relationship between such patients and such institutions including maintenance, custody, treatment, parole and discharge * * *. [Emphasis supplied]
I am convinced that the Legislature did not intend Morristown Memorial Hospital as an institution within the meaning *114 of the statute simply because it includes among its patients, for general medical services, mentally retarded persons. The bill of rights for mentally retarded confers no authority for sterilization in this case.
The other statutory provision concerning sterilization is N.J.S.A. 30:6D-5(a)(4), which provides that
a. No person receiving services for the developmentally disabled at any facility shall:
* * * * * * * *
(4) be subjected to shock treatment, psychosurgery, sterilization or medical behavioral or pharmacological research without the express and informed consent of such person, if a competent adult, or of such person's guardian ad litem specifically appointed by a court for the matter of consent to these proceedings, if a minor or an incompetent adult or person administratively determined to be mentally deficient. Such consent shall be made in writing and shall be placed in such person's record.
Either the party alleging the necessity of such procedure or such person or such person's guardian ad litem may petition a court of competent jurisdiction to hold a hearing to determine the necessity of such procedure at which the client is physically present, represented by counsel, and provided the right and opportunity to be confronted with and to cross-examine all witnesses alleging the necessity of such procedure. In such proceedings, the burden of proof shall be on the party alleging the necessity of such procedure.... Under no circumstances may a person in treatment be subjected to hazardous or intrusive experimental research which is not directly related to the specific goals of his treatment program.
This statute also was intended as a protective measure. It provides that a person who is incapable of giving informed consent may be sterilized only with consent of a court-appointed and authorized guardian.
The Public Advocate insists that this legislative enactment was intended to apply to every hospital or doctor providing a service of any kind to a person with a developmental disability. He relies on the preamble as set forth in N.J.S.A. 30:6D 2:

*115 The Legislature finds and declares that the developmentally disabled are entitled to certain fundamental rights as citizens and that these rights shall not be abrogated solely by reason of admission to any facility or receipt of any service for developmentally disabled persons; that services which are offered to the developmentally disabled shall be provided in a manner which respects the dignity, individuality and constitutional, civil and legal rights of each developmentally disabled person; and that it is the purpose of this act to denote such rights and establish standards for the provision of such services.
Although a preamble is not a part of an act and will not control the enacting part of a statute where the statute is expressed in clear, unambiguous terms, it may be considered to assist in determining the intention of lawmakers where any doubt arises concerning the construction to be placed on the enacting part. Blackman v. Iles, 4 N.J. 82, 91 (1950).
If the Public Advocate's position is sound and the statutory coverage includes all developmentally disabled persons, then Lee Ann Grady comes within the scope of the statute. However, that position finds little support in the definitions of and references to the terms "facility" and "services" throughout the statute.
The term "facility" is defined as
* * * a facility operated by any public or private agency, organization or institution for the provision of services for persons with developmental disabilities. [N.J.S.A. 30:6D-3(c)]
"Services" is defined as
* * * specialized services or special adaptations of generic services provided by any * * * agency, organization or institution and directed toward the alleviation of a developmental disability or toward the social, personal, physical, or economic habilitation or rehabilitation of an individual with such a disability * * * [N.J.S.A. 30:6D-3(b)]
Surely the legislative concern is to protect the rights of developmentally disabled persons resident in or attendant at particular *116 institutions.[13] The Senate Health and Welfare Committee Statement expresses this idea:
The provisions of this bill apply to persons in residence or attendance at any public or private facility for the developmentally disabled.
The substantive provisions of the act define the relationship between patient and facility; guarantee the exercise of such rights as voting, pursuit of religious beliefs, reasonable opportunities to interact with members of the opposite sex, receiving and sending correspondence; require individualized habilitation treatment programs, and finally allow for the appointment of an attorney for a patient who cannot afford counsel and directing that payment shall be made by the county from which the person was "admitted." N.J.S.A. 30:6D-4, 5. This enumeration of rights could only have been intended to apply to residents or out-patients "admitted" to state or private institutions or facilities for the developmentally disabled.
Furthermore, an interpretation that the act applies to every developmentally disabled person in this State would render significant portions of the act irrelevant surplusage. A well-established rule of statutory construction mandates the presumption that all express provisions have a legislative purpose. Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 68 (1978); Abbotts Dairies v. Armstrong, 14 N.J. 319, 327-328 (1954); Hoffman v. Hock, 8 N.J. 397, 406-407 (1952). Plain logic dictates that had the Legislature intended to include all such persons, it would have been much simpler to say so.
*117 I am satisfied that the manifest design of the Legislature in enacting the Developmentally Disabled Rights Act was to protect vulnerable individuals who are residents or outpatients of certain institutions from unwarranted research, treatment or surgery.[14]

The Inherent Parens Patriae Jurisdiction of the Court of Chancery
In the past the weight of authority has supported the conclusion that, unless expressly empowered by statute, courts lack jurisdiction to issue an order approving the sterilization of a mental incompetent. Guardianship of Tulley, 83 Cal. App.3d 698, 146 Cal. Rptr. 266 (D.Ct.App. 1978), rev. den. 439 U.S. 967, 99 S.Ct. 1519, 59 L.Ed.2d 783 (1979); Guardianship of Kemp, 43 Cal. App.3d 758, 118 Cal. Rptr. 64 (D.Ct.App. 1974); In re M.K.R., 515 S.W.2d 467 (Mo.Sup.Ct. 1974). Matter of S.C.E., 378 A.2d 144 (Del. Ch. 1977); Sparkman v. McFarlin, 552 F.2d 172 (7 Cir.1977), rev. sub nom. Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), reh. den. 436 U.S. 951, 98 S.Ct. 2862, 56 L.Ed.2d 795; A.L. v. G.R.H., 163 Ind. App. 636, 325 N.E.2d 501 (Ct.App. 1975), cert. den. 425 U.S. 936, 96 S.Ct. 1669, 48 L.Ed.2d 178 (1976); Application of A.D., 90 Misc.2d 236, 394 N.Y.S.2d 139 (Surr.Ct. 1977), aff'd on other grounds, 64 App.Div.2d 898, 408 N.Y.S.2d 104 (App.Div. 1978); Wade v. Bethesda Hospital, 337 F. Supp. 671 (S.D.Ohio, E.D. 1971) reh. den. 356 F. Supp. 380 (S.D.Ohio, E.D. 1973); Frazier v. Levi, 440 S.W.2d 393 (Tex.Civ. App. 1969); Holmes v. Powers, 439 S.W.2d 579 (Ky. 1969); In re Lambert, No. 61156 (Tenn.P.Ct. 1976), cited in Burghdorf & *118 Burghdorf, "The Wicked Witch is Almost Dead; Buck v. Bell and the Sterilization of Handicapped Persons", 50 Temp.L.Q. 995, 1022, n. 197 (1975).[15]
However, the United States Supreme Court, by its decision in Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), reh. den. 436 U.S. 951, 98 S.Ct. 2862, 56 L.Ed.2d 795 (1978), dispelled any argument that the presence of statutory provisions regarding sterilization constitutes the sole jurisdictional authority available to a court to act on a petition for sterilization:
The statutory authority for the sterilization of institutionalized persons in the custody of the State does not warrant the inference that a court of general jurisdiction has no power to act on a petition for sterilization of a minor in the custody of her parents, particularly where the parents have authority under the Indiana statutes to "consent to and contract for medical or hospital care or treatment of [the minor] including surgery." [Citation omitted] [at 358, 98 S.Ct. at 1105.]
Interestingly, were not jurisdictional authority available for substituted consent for sterilization other than by statute, this court's finding that the statute does not apply would generate an equal protection problem. Arguably, institutionalized incompetents would, upon satisfying the statutory requirements, have access to sterilization. However, the noninstitutionalized would have been denied equal protection, having no access to substituted consent for sterilization available by way of either statute or inherent court jurisdiction.
*119 Faced with such a dilemma the Federal District Court of Connecticut elected to interpret the statute there[16] as including all incompetents, whether institutionalized or not, within its purview. Ruby v. Massey, 452 F. Supp. 361 (D.Conn. 1978).
Such a ruling, extending the statute beyond its express coverage, assumes the lack of inherent jurisdiction in any court of Connecticut to consider sterilization of noninstitutionalized incompetents absent statutory authority. I find, however, that the New Jersey statutory language justifies the conclusion that our Legislature assumed quite the contrary, i.e., that the courts in this State do have the inherent power to entertain such an application where noninstitutionalized incompetents are involved.
I cannot conclude that the Legislature intended, in passing the Developmentally Disabled Rights Act, to deprive the Chancery *120 Court of parens patriae jurisdiction to authorize substituted consent for the sterilization of an incompetent in the custody of her parents.
Hence, the critical question; whether the parens patriae jurisdiction of the Chancery Court may be invoked to permit the court to consider the parents' request to give substituted consent on behalf of their incompetent child. Were substituted consent impermissible, the very incompetence which entitles one to special protection would become the obstacle to the exercise of those constitutional privileges necessary for enjoyment of that special protection. Refusal to provide a technique for vindication of a basic constitutional right is itself an unconstitutional deprivation. As enunciated by the court in Ruby v. Massey, supra:
This lawsuit is unmistakably a cry for help from these children uttered in their behalf by their parents. These children are what they are; they are unable to come to terms with reality sufficiently to make the decisions which are only theirs to make. That they are incapable of comprehending the consequences of their actions is clear beyond question. The fact that the demand for an "informed" decision from each of the children is an impossible one to meet makes imperative the need for an authoritative decision on their behalf. [at 367.]
Here, too, informed consent of the incompetent is impossible to obtain. Unless substituted judgment may be exercised on her behalf, Lee Ann Grady would be deprived of any opportunity to assert a basic constitutional right.
An analogous use of the parens patriae doctrine was applied in In re Quinlan, 137 N.J. Super. 227 (Ch.Div. 1975), mod., 70 N.J. 10 (1976). There the father of a 21-year-old woman, who was permanently unable to give or withhold consent as a result of severe medical problems, requested appointment as guardian. He sought the express power to authorize the discontinuance of *121 all extraordinary means of sustaining the vital processes of his daughter.
With respect to the jurisdictional issue, the trial judge relied on the doctrine of parens patriae to permit the court, as representative of the sovereign, to intervene in the "best interests" of the incompetent. Judge Muir quoted 27 Am.Jur.2d, Equity, § 69 (1969), with respect to equity's power and responsibility:
As part of the inherent power of equity, a court of equity has full and complete jurisdiction over the persons of those who labor under any legal disability. * * * The court's action in such a case is not limited by any narrow bounds, but it is empowered to stretch forth its arm in whatever direction its aid and protection may be needed. While this is indeed a special exercise of equity jurisdiction, it is beyond question that by virtue thereof the Court may pass upon purely personal rights. [137 N.J. Super. at 254]
The Supreme Court upheld the trial judge's perception of the responsibility of equity to vindicate an incompetent's right of independent choice:
Our affirmation of Karen's independent right of choice, however, would ordinarily be based upon her competency to assert it. The sad truth, however, is that she is grossly incompetent and we cannot discern her supposed choice based on the testimony of her previous conversations with friends, where such testimony is without sufficient probative weight. (citation omitted) Nevertheless we have concluded that Karen's right of privacy may be asserted on her behalf by her guardian under the peculiar circumstances here present.
If a putative decision by Karen to permit this non-cognitive, vegetative existence to terminate by natural forces is regarded as a valuable incident of her right to privacy, as we believe it to be, then it should not be discarded solely on the basis that her condition prevents her conscious exercise of the choice. The only practical way to prevent destruction of the right is to permit the guardian and family of Karen to render their best judgment, subject to the qualifications hereinafter stated, as to whether she would exercise it in these circumstances. If their conclusion is in the affirmative this decision should be accepted by a society the overwhelming majority of whose members would, we think, in similar circumstances, exercise such a choice in the same way for themselves or for those closest to them. It is for this reason that we determine that Karen's right of privacy may be asserted in her behalf, in this respect, by her guardian and family under the particular circumstances presented by this record. [70 N.J. at 41-42.]
*122 The instant case is equally appropriate for the exercise of parens patriae jurisdiction.[17] Hence, I find that a court of equity does possess the inherent parens patriae jurisdiction to consider and act upon the application here presented.

Applicable Standards and Procedure
The task remaining is to establish standards applicable in the exercise of the court's parens patriae jurisdiction.
Most reported opinions providing for substituted consent for medical or surgical procedures in New Jersey involve "lifesaving" treatment. John F. Kennedy Memorial Hosp. v. Heston, 58 N.J. 576 (1971); State v. Perricone, 37 N.J. 463 (1962); In re Schiller, 148 N.J. Super. 168 (Ch.Div. 1977). Judge Dreier, in connection with a blood transfusion application, held that imminent danger of severe and irreparable brain damage was sufficient to allow a guardian to exercise such substituted consent. Muhlenberg Hosp. v. Patterson, 128 N.J. Super. 498 (Law Div. 1974).
The Public Advocate and Attorney General both insist that the court must find "necessity" in order to justify the relief demanded by this application. The "necessity" test is difficult to apply to sterilization requests because they are not ordinarily based upon threat to life or serious, immediate risk to health, as in the cited blood transfusion cases.

*123 The word "necessary" has no fixed meaning or character peculiar to itself. It is flexible and relative. It is an adjective expressing degrees, and may express mere convenience or that which is indispensable or an absolute physical necessity. It may mean something which in the accomplishment of a given object cannot be dispensed with, or it may mean something reasonably useful and proper, and of greater or lesser benefit or convenience, and its force and meaning must be determined with relation to the particular object sought, and is a relative and comparative term, depending upon its application to the object sought. * * * [Chicago, I & L. Ry. Co. v. Baugh, 175 Ind. 419, 94 N.E. 571, 573 (Sup.Ct. 1911)]
I cannot conclude that sterilization is to be available for an uninstitutionalized incompetent only where necessary to preserve life itself or prevent irreparable brain damage.[18] Hence, I reject the arguments of the Attorney General and Public Advocate and adopt that of the guardian ad litem, particularly as he states it in his summation:
To accept the Public Advocate's and the Attorney General's position would necessitate the utterly unacceptable result that every participant in this proceeding, including this Court, might conclude on the basis of competent medical and other testimony that sterilization is clearly in my ward's personal best interest, yet, the operation be prohibited because not "necessary."
* * * this would certainly reduce my ward and all similarly situated to the status of second class citizens. And I find it ironic that both Public Advocate and the Attorney General should believe that "necessity" ought to be the impelling circumstance here.
In addition to need, this court must also consider, when entertaining an application for authorization to substitute consent, the good faith of the applicants, their interest, their motives and the weight to be given to their judgment.
Consistent with the common law attitude toward parental authority and responsibility, decisions regarding the care of a *124 child and the medical and surgical treatment to be provided have traditionally been made by the parents. The United States Supreme Court has recognized the sanctity of the parent-child relationship:
It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder ... And it is in recognition of this that these decisions have respected the private realm of family life which the State cannot enter. [Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944)]
Recently, the United States Supreme Court has considered the status of parents with regard to commitment of their children to mental hospitals. Although commitment to a mental institution results in a "massive curtailment of liberty," Humphrey v. Cady, 405 U.S. 504, 599, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), nevertheless, parents may legitimately be permitted to commit children for a limited period of time before a formal hearing is conducted. Parham v. J.R., ___ U.S. ___, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979).
For centuries, according to Mr. Justice Stewart's concurring opinion, "it has been a canon of the common law that parents speak for their minor children. So deeply imbedded in our tradition is this principle of law that the Constitution itself may compel a State to respect it." Id., ___ U.S. at ___, 99 S.Ct. at 2513.
The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition. [Wisconsin v. Yoder, 406 U.S. 205 at 232, 92 S.Ct. 1526, 1541-42, 32 L.Ed.2d 15 (1972)].
No one has a better right or responsibility and no one is in a better position nor is better equipped than the child's parents to decide what course to pursue. Since no one will ever know what *125 answer the incompetent would give, how can the parents give the wrong answer? Since there could be no objectively right or wrong answer, the burden should not be on the parents to establish that what is right for them is necessarily right for others.[19]
In this regard, I find the guardian ad litem's eloquent argument persuasive. He urges that these parents have thought the problem through rationally, that they are kind, loving and caring parents and want only what is in Lee Ann's best interest. He adds:
I have a feeling that their intuitive feeling for her best interest may be a better indicator than all of our articulated ideas. And by "our" I include lawyers, doctors, psychologists and the like as experts as to what is best for Lee Ann.
Lee Ann Grady is unable to care for herself now and will, in all likelihood, be unable to care for herself in the future. She is unable to make a voluntary decision concerning procreation, contraception or sterilization. I find that no one is more concerned for her welfare than her parents. No one is better equipped than those parents to decide what course to pursue.
Nevertheless, before this court may exercise its inherent power to grant this application the following conditions must exist:
1. That the subject is incapable of understanding the nature of the sexual function, reproduction or sterilization and cannot comprehend the nature of these proceedings, hence is incompetent;[20]

*126 2. That such incompetency is in all likelihood permanent;
3. That the incompetent is presumably not infertile and not incapable of procreation;
4. That all procedural safeguards have been satisfied, including appointment of a guardian ad litem to act as counsel for the incompetent during court proceedings, with full opportunity to present proofs and cross-examine witnesses;
5. That the applicants have demonstrated their genuine good faith and that their primary concern is for the best interests of the incompetent rather than their own or the public's convenience.
I am fully satisfied that all of those criteria have been met here.

Conclusion
Lee Ann Grady cannot exercise her freedom of choice as guaranteed by the Constitution. If her incompetency is not to deprive her of the benefit of constitutionally protected alternatives, her parents as her general guardians must, under the circumstances of this case, be permitted to exercise their judgment as to how that choice should be made.
It is not for this court to substitute its judgment for the informed consent of Lee Ann Grady nor, as has been suggested, to weigh the relative advantages and risks of other methods of contraception. It is, instead, appropriate under these circumstances, having set forth and followed all appropriate procedural safeguards, to authorize and empower her parents as general guardians to decide as they deem she would were she capable of informed judgment. This may include, in their sound discretion, the exercise of their substituted consent to any method of *127 temporary or permanent contraception as shall conform with responsible medical advice.
Any decision arrived at by the parents as guardians is to be protected from public scrutiny. Lee Ann has the same right to privacy as do all other persons. Therefore, that decision is protected by the same privilege as all matters between physician or hospital and patient and should be arrived at privately without public disclosure.
This decision is not to be interpreted as authorizing parents to consent to the sterilization of incompetent persons absent authorization by a court of competent jurisdiction. Each application must be decided on its own merits.
Lee Ann is entitled to be treated with dignity, in a manner designed to permit her to realize her greatest potential; she is entitled to be dealt with as an individual rather than as a member of a limited class; she is entitled to participate in such activities as are enjoyable and meaningful to her. The thrust of this opinion is to enable Lee Ann to enjoy these shared common entitlements unhindered by her limitations.
NOTES
[1] I am indebted to all counsel for their comprehensive research and presentations. Particular recognition must be accorded the guardian ad litem for his informative and well-documented "Supplemental Appendix" on Down's Syndrome.
[2] Koch and de la Cruz, Down's Syndrome (Mongolism): Research, Prevention and Management 106-7 (1975).
[3] Pueschel, Down's Syndrome: Growing and Learning 64 (1978).
[4] Baumeister, Mental Retardation 1 (1967).
[5] White, The Special Child: A Parents' Guide to Mental Disabilities 148, 152 (1978).
[6] de la Cruz and LaVeck, Human Sexuality and the Mentally Retarded 58 (1973).
[7] Buckler, Living With A Mentally Retarded Child 78 (1971).
[8] Koch and Koch, Understanding the Mentally Retarded Child (1974).
[9] It is unusual for patients with Down's Syndrome to produce children. In the limited clinical research available the subjects have been exclusively females. Consistent with genetic probability, approximately one-half of the offspring had Down's Syndrome. The Children's Hospital Medical Center, Boston, in response to an inquiry of the parents in the instant case, report that fertility in Down's Syndrome women is reduced compared to that of normal women. They cite a case study of 19 offspring born to Down's women. Eight of the infants have Down's Syndrome, one had a normal chromosomal pattern but was mentally retarded, two were normal but stillborn (twin pregnancy, one stillborn with no reported karyotype, and seven were normal.
[10] For background history on eugenic sterilization, see e.g., Kindregan, "Sixty Years of Compulsory Eugenic Sterilization: `Three Generations of Imbeciles' and the Constitution of the United States," 43 Chi.-Kent L.Rev. 123, 142-143 (1966); O'Hara and Sanks, "Eugenic Sterilization," 45 Geo.L.J. 120 (1956); Vukowich, "The Dawning of the Brave New World  Legal, Ethical and Social Issues of Eugenics," 1971 U.Ill.L. Forum 189.
[11] See, Note, "Eugenic Sterilization  A Scientific Analysis," 46 Den.L.J. 631, 642 (1969); Comment, "Eugenic Sterilization Statutes: A Constitutional Reevaluation," 14 J.Fam.L. (1975); and Ferster, "Eliminating the Unfit: Is Sterilization the Answer?" 27 Ohio St.L.J. 591, 594, n. 14 (1966).
[12] Thus, while N.J.S.A. 30:11-9, which permits hospitals to refuse to perform sterilizations on religious grounds, is still valid, those provisions are not relevant to the present controversy since Morristown Memorial is not objecting to performing the sterilization but simply seeks legally sufficient consent.
[13] The Public Advocate contends that the act applies to Lee Ann Grady because she attends a special class in a public school. The public school system is not a facility within the statutory definition. It is, rather, operated for the provision of educational services to all citizens, and, incidentally provides special education programs for those who require it.
[14] The judicial concern expressed in recent years to protect persons facing involuntary commitment to mental hospitals by way of full and fair adversarial hearings, Specht v. Patterson, 386 U.S. 605, 610, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), reflects recognition of the vulnerability of those committed to such institutions.
[15] These cases appear to have treated the applications as for involuntary sterilization. I view it as inappropriate to consider the present application as seeking either voluntary or involuntary sterilization: neither compulsory nor consensual relief, in the literal sense, is sought. No discussion of the legal attitudes toward it is feasible without distinguishing between "voluntary" and "compulsory" sterilization. Voluntary sterilization on a widespread scale is a comparatively recent development and is chosen principally as a reliable contraceptive technique. See Gray, "Compulsory Sterilization in a Free Society: Choices and Dilemmas," 41 U.Cinn.L.Rev. 529, 533 (1972).
[16] Conn. Gen. Stat. § 19-569(g), P.A. No. 118, § 2, 1969:

The superintendent of the Mansfield Training School and the superintendent of The Southbury Training School are authorized and directed to appoint for each of said institutions two skilled surgeons, who, in conjunction with the physician or surgeon in charge at each of said institutions, shall constitute a board the duty of which shall be to examine such patients of said institutions as are reported to them, by the superintendent or the physician or surgeon in charge, to be persons by whom procreation would be inadvisable. Such board shall examine the physical and mental conditions of such persons, and if, in the judgment of a majority of such board, procreation by any such person would be inadvisable because he is incapable of comprehending the consequences of his actions, the superintendent of the institution shall make application to the probate court in the district wherein such institution is located for consent for such board to appoint one of its members to perform the operation of vasectomy or tubal surgery, as the case may be, upon such person. Such operations shall be performed in a safe and humane manner, and shall be performed only with the written consent of the responsible next of kin or guardian of the person involved or, if there is none, with the approval of the board of trustees of the institution. The board making such examination and the surgeon performing such operation shall receive from the state such compensation for services rendered as the superintendent of either of said schools deems reasonable.
[17] The inherent power of the court to act in a sterilization case has been recognized in Matter of Sallmaier, 85 Misc.2d 295, 378 N.Y.S.2d 989 (Sup.Ct. 1976). However, in Application of A.D., supra, a New York Surrogate's Court specifically disagreed with Sallmaier. An Ohio court also found such inherent authority, In re Simpson, 180 N.E.2d 206 (P.Ct. 1962), however, that order was issued by a judge who was later to be charged in Sparkman v. McFarlin, supra, rev. sub nom. Stump v. Sparkman, supra, with exceeding his jurisdiction.
[18] I am satisfied that a less stringent standard may be applied to applications made in good faith by parents as compared to application made for state wards or by appointed guardians acting in loco parentis. Parham v. J.R., ___ U.S. ___, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979).
[19] There is a strong presumption in our law in favor of parental autonomy and family privacy and against coercive state intervention. Goldstein, "Medical Care for the Child at Risk: On State Supervention of Parental Autonomy," 86 Yale L.J. 645, 655 (1977).
[20] Recently the United States Supreme Court has held that the proper evidentiary standard to be applied to civil commitments to satisfy the due process requirements of the Fourteenth Amendment to the United States Constitution is by "clear and convincing" proof. I am satisfied that such a standard is applicable in determining incompetency here and I have found that the standard has been met with regard to Lee Ann Grady. Addington v. Texas, 441 U.S. ___, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).